UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
) Criminal No. 04-CR-10336-NMG
v. )
)
JULIO CARRION SANTIAGO et al. )
)

**GOVERNMENT'S OPPOSITION TO MOTIONS TO SUPPRESS EVIDENCE FILED BY DEFENDANTS JULIO SANTIAGO (1), PEDRO ALBERTO MIRANDA (2) and EDWIN TORRES (8)**

## Introduction

The government, by and through the undersigned attorneys, now opposes the motions filed by Defendants Julio Santiago ("Santiago"), Edwin Torres ("Torres") and Pedro Alberto Miranda a/k/a Carlos Colon ("Miranda") to suppress certain evidence in the captioned matter. The government now files this consolidated memorandum to address each of the motions filed by Santiago, Torres and Miranda.[1]

## Procedural History

Twelve defendants including Santiago, Torres and Miranda, are charged in an eight-count Superseding Indictment. Santiago, Torres and Miranda are charged in Count I (charging them and all of their co-defendants with conspiring to distribute and possess with intent to distribute one kilogram or more of heroin between in or about December 2003 to on or about October 15, 2004). Santiago is also charged in Count Seven charging him with possession of a firearm and silencers in furtherance of a drug trafficking crime in violation of 18 U.S.C. §924(c) and Count Eight with

[1]Since the motion filed Defendant Zuleima Reyes seeks to suppress wire interceptions, the government has addressed that motion in a separate memorandum filed under separate cover.

possession unregistered firearms (namely, three silencers) in violation of 26 U.S.C. §5861(d). Santiago filed a motion to suppress any and all items seized from his residence on 264 Mechanic Street, Leominster, Massachusetts; Miranda filed a motion to suppress evidence seized from 212 Wilder Street, Lowell, Massachusetts; and Torres filed a motion to suppress all items seized from Storage Unit J1 at Mini Self-Storage, 3 Foundry Street, Lowell, Massachusetts. By Order of this Court (dated April 29, 2005), the Court allowed the government to file a consolidated opposition to these motions by June 6, 2005.

**Factual Background**

Unless otherwise noted, the following summary of facts is based upon the Affidavit of Drug Enforcement Administration ("DEA") Special Agent Calice Couchman ("Couchman Affidavit" or "Couchman Aff."), submitted in support of a criminal complaint against Santiago, Miranda, Torres and eight of the other co-defendants and an application for search warrant of six locations including but not limited to Santiago's residence at 264 Mechanic Street, Leominster, Massachusetts, Miranda's residence at 212 Wilder Street, Leominster, Massachusetts and space leased by Torres at Mini Self Storage, 3 Foundry Street, Lowell, Massachusetts [Exhibit 1]; affidavit of DEA Special Agent Couchman in support of a criminal complaint against co-defendant Juan Nunez ("Couchman Aff. II") [Exhibit 2]; the search warrants and the search warrant returns for three locations enumerated above. [Exhibit 3]. These documents are attached hereto.

**Initial Surveillance of Santiago**

The charges against the defendants arose out an investigation conducted by DEA. (Couchman Aff. ¶¶5, 9). Information from a confidential informant ("CI-3") and subsequent law enforcement surveillance revealed that an individual (later identified as co-defendant Reynaldo

Rivera) was engaged in a series of apparent drug transactions occurring in the parking lot of Rivera's residence at the Old English Village apartment complex at 235 18th Street and that usually Rivera engaged in these hand-to-hand exchange with the operator of a minivan driven by a male later identified as Santiago ("Santiago minivan"). (Couchman Aff. ¶12). Between December 2003 and January 2004, an undercover agent arranged several heroin transactions with Rivera. (Couchman Aff. ¶¶32-42). In each of these transactions, the undercover agent would negotiate the price and quantity of heroin and the location (usually Showcase Cinema parking lot in Lowell) to receive the heroin with Rivera (or with co-defendant Zuleima Reyes who would then contact Rivera) by telephone. (Couchman Aff. ¶¶32-42). Pen register data showed that Rivera's cell phone was then in contact with a telephone subscribed to by one of Rivera's runners, co-defendants Santiago Arroyo or Zuleima Reyes. (Couchman Aff. ¶¶32-42). The undercover agent would then meet Arroyo or Reyes and would receive gram-quantities of heroin in exchange for cash. (Couchman Aff. ¶¶32-42). In a series of calls on February 12, 2004, TFA Chavez, Rivera and Reyes negotiated another heroin transaction. (Couchman Aff. ¶¶43-45). Although this transaction never took place, surveillance at and around Rivera's 235 Eighteenth Street residence during the time of this negotiation saw Santiago and Rivera meet and pen register data showed that phones used by the two were in contact prior to this meeting. (Couchman Aff. ¶44). Pen register data showed that the Rivera cell phone called Reyes' cell phone after his meeting with Santiago. (Couchman Aff. ¶45). Based upon surveillance, pen register information, the investigation tentatively identified Santiago as Rivera's source of supply for heroin as of February 2004. (Couchman Aff. ¶12). As described in further detail below, subsequently intercepted calls, surveillance and seizures confirmed that Santiago was Rivera's source of supply.

**Interception of Wire Communications of Santiago and Others, Including But Not Limited to Miranda and Torres, Begins**

The wiretap phase of the investigation began on March 16, 2004. (Couchman Aff. ¶46). The Court authorized the interception of wire communications occurring over the following telephones and interceptions were made during the enumerated time periods: 1) 978-423-8173, a Nextel cellular telephone subscribed to in the name of Rivera and used by Rivera ("the Rivera cell phone") from March 16, 2004 and April 1, 2004; 2) 347-200-5004, a T-Mobile cellular telephone with no subscriber information used by Santiago ("Target Telephone 1") from June 2, 2004 to July 1, 2004 and again from August 16, 2004 to September 13, 2004; 3) 347-248-7669, a T-mobile cellular telephone with no subscriber information used by Santiago ("Target Telephone 2") from June 29, 2004 to July 28, 2004 and again from August 16, 2004 to September 7, 2004; 4) 917-815-3487, a T-Mobile telephone with no subscriber information other than a March 10, 1981 date of birth used by Santiago ("Target Telephone 3") from September 30, 2004 to October 15, 2004; 6) 978-408-9075, a Sprint cellular telephone subscribed in the name of Paula Llano, 212 Wilder St., Apt. 2, Lowell, Massachusetts and used by Miranda ("Target Telephone 4") from September 30, 2004 to October 15, 2004; and 7) 978-788-0589, a paging device bearing a cap code of A009880984, operating on frequency 929.6625MHz, owned by Metrocall Wireless, 890 East Heinburg Street, Pensacola, FL 32502, and subleased to New England Paging, a reseller, at P.O. Box 1644, Lowell, Massachusetts and used by Santiago ("Target Pager") from September 14, 2004 to October 15, 2004 (collectively, the "Target Telephones"). (Couchman Aff. ¶¶46, 48, 63).

Intercepted calls over the Target Telephones confirmed that Santiago was supplying heroin not only to Rivera, but was making regular deliveries to, and collecting drug monies from numerous

other drug customers, including Torres' that he had numerous drug associates including Miranda; and that he had a source of supply in New York (later identified as co-defendant Juan Nunez).[2] For example, at approximately 11:49 a.m. on June 6, 2004, during the course of an intercepted conversation, Santiago asked if co-defendant Jose Rodriguez ("Rodriguez") "still need[ed] 'the money'" and Rodriguez answered affirmatively. (Couchman Aff. ¶49). Santiago then indicated that he was going to take sixty (60) "dollars" out of the bank and would then call Rodriguez, but asked if Rodriguez would be there for sure so that Santiago did not make the trip for nothing. (Couchman Aff. ¶49). Rodriguez assured that he would be there. (Couchman Aff. ¶49). Rodriguez indicated that he would be available before 3:00 p.m. (Couchman Aff. ¶49 ). Santiago then reiterated that he would withdraw "that" from that "account" and they agreed to speak again later. (Couchman Aff. ¶49). In this intercepted conversation, agents understood that Santiago confirmed that Rodriguez still wanted to purchase sixty (60) units of heroin and agreed to deliver them that afternoon. (Couchman Aff. ¶49). Surveillance was subsequently established shortly after noon near Santiago's residence. (Couchman Aff. ¶50). At approximately 2:30 p.m., a surveillance unit saw Santiago drive the his vehicle ("Santiago minivan") out of a small lot behind his 264 Mechanic Street residence. (Couchman Aff. ¶50). At approximately 3:32 p.m., Santiago called Rodriguez, asked if the latter was available and indicated that he had been waiting for Rodriguez's call. (Couchman Aff. ¶51). Toward the end of the conversation, Santiago said he was leaving now to go "there"

---

[2] Intercepted conversations on the Target Telephones were in Spanish. The summaries of intercepted conversations on the Target Telephones summarized in this memorandum are based upon summaries of conversations and draft translations that have been prepared by monitors who are fluent in Spanish and English. The calls summarized below are not all of the calls that have been intercepted, nor are the summaries verbatim accounts of each call. Where necessary, an interpretation of the substance of the calls is provided.

(meaning to meet Rodriguez). (Couchman Aff. ¶51). At approximately 4:06 p.m., Santiago called Rodriguez and indicated he was "there" but asked how things were because he saw too many cars there. (Couchman Aff. ¶52). Rodriguez reassured him that everything was fine and Santiago repeated that he had arrived. (Couchman Aff. ¶52).

At approximately 4:10 p.m., a surveillance agent saw Santiago driving the Santiago minivan slowly past Rodriguez's residence. (Couchman Aff. ¶53). After parking Santiago's minivan, Santiago was seen seated in Santiago's minivan, bending and shifting from one side to another, as if retrieving something from the van's interior. (Couchman Aff. ¶53). Approximately one minute later, the surveillance agent saw Santiago exit Santiago's minivan and appear to fold under and then pull the bottom of his shirt. (Couchman Aff. ¶53). Another surveillance officer then saw Santiago walk to the rear of the residence and walk up the stairs to the second-floor apartment. (Couchman Aff. ¶53). At approximately 4:39 p.m., a third surveillance officer saw Santiago exit the residence, return to the Santiago minivan and drive it out of the area. (Couchman Aff. ¶53). At approximately 6:40 p.m., a surveillance officer saw Rodriguez exit his apartment and walk from the rear of the premises out to Aiken Avenue, looking cautiously in all directions and with his right hand shoved deeply into the right pocket of his baggy running pants. (Couchman Aff. ¶53). Approximately a block and a half from his residence, Rodriguez saw and waved down a car driven by a Hispanic male later identified as Santiago Navarro. (Couchman Aff. ¶53). Rodriguez entered the front passenger seat of the BMW and the car then drove off. (Couchman Aff. ¶53).

A short while later, the BMW was stopped by police. (Couchman Aff. ¶54). Police subsequently seized a clear plastic baggie containing a "finger" of heroin (weighing approximately 10 grams) from Rodriguez's person. (Couchman Aff. ¶54). The Lowell Police Department then

obtained a state warrant to search Rodriguez's apartment at 261 Aiken Avenue. (Couchman Aff. ¶55). During that search, approximately 50 grams of heroin were seized. (Couchman Aff. ¶55). The sequence of intercepted calls between Santiago and Rodriguez, the subsequent surveillance and seizure from Rodriguez and Rodriguez's residence confirmed that the "sixty dollars" referenced in Santiago's initial June 6 telephone conversation with Rodriguez was a coded reference to 60 grams of heroin (the 10 grams of heroin seized from Rodriguez's person and the 50 grams of heroin seized from his residence). (Couchman Aff. ¶55).

The very next day, law enforcement agents made another seizure of heroin that had been supplied by Santiago. (Couchman Aff. ¶¶56-62). On the morning of June 7, 2004, Rivera called Santiago, asked if the latter were coming that day and whether Santiago had recorded the "CD." (Couchman Aff. ¶56 ). Santiago replied by saying he would call back, which he did at approximately 12:09 p.m., at which time Rivera asked Santiago to bring Rivera a Salsa "CD" and a Bachata "CD." (Couchman Aff. ¶56). After confirming the order, Santiago asked if Rivera wanted two different "CDs" or separate ones (meaning two units of heroin). (Couchman Aff. ¶56). Rivera replied by asking Santiago to put them in two different cases (meaning that the heroin should be separately packaged). (Couchman Aff. ¶56). In subsequent conversations that day, Santiago indicated that he would leave "the papers" (heroin) in what Rivera to referred to as "the office" or "the cabinet" (Rivera's car) where Santiago had previously left "the papers." (Couchman Aff. ¶57). Surveillance followed Santiago and saw him place an item inside of a vehicle which was registered to Rivera and was parked in the parking lot of the apartment complex where Rivera resided. (Couchman Aff. ¶58). Santiago had not used a key to enter the vehicle, so, after Santiago had departed the area, a surveillance agent opened the same door to Rivera's vehicle and, in a pouch on the inside of the

door, found and retrieved two packages, each of which were later found to contain ten (10) grams of heroin. (Couchman Aff. ¶58). A few minutes later, Santiago called Rivera and reported that he had left "the plant" there so that Rivera could check on it and Rivera agreed to do so. (Couchman Aff. ¶57). Subsequent calls that evening and the following day indicated that Rivera could not find "the papers" (heroin) that Santiago had left for him in the vehicle despite the fact that Santiago swore to him that he had left it for him there. (Couchman Aff. ¶59). The two made arrangements to meet on June 9, 2004 to, based upon the intercepted calls and subsequent surveillance, have Santiago replace the heroin that law enforcement officers had seized from Rivera's vehicle. (Couchman Aff. ¶¶59-62).

Throughout the interception of the Target Telephones, intercepted calls between Santiago and others and related surveillance revealed that Santiago was supplying heroin to numerous customers including Torres and others and that Miranda was assisting Santiago in his drug distribution business.[3] Although there were many intercepted calls and related surveillance that were drug-related, this factual summary focuses on a selection of interceptions and surveillance that relate to defendants Santiago, Miranda and Torres and the claims that they raise in their pending motions.

**Santiago's Home Base Was His Residence at 264 Mechanic Street**

Santiago often made drug deliveries to (or collected drug monies from) his customers at their

---

[3]Prior to arrest and execution of search warrants on October 15, 2004, another 10 grams of heroin supplied by Santiago was seized on August 26, 2004. (Couchman Aff. ¶95). This seizure occurred after intercepted calls between Santiago and co-defendant Jose Torrado about heroin that Santiago left for Torrado to retrieve in a coffee cup from Santiago's van, surveillance of Torrado retrieving it and Torrado, upon spotting law enforcement trailing him, throwing the cup with the heroin out of his car window. (Couchman Aff. ¶92-95).

residences, or, on several occasions, at the 212 Wilder Street residence of Miranda. As surveillance revealed, however, he was living at 264 Mechanic Street throughout the time that he was conducting his heroin distribution business and he would often leave his residence to deliver to drug customers and/or return to his residence after receiving drug monies from them or after having traveled to get a supply of heroin from his New York-based supplier.

For example, during an August 18, 2004 intercepted call, Santiago and co-defendant Carlos Sanchez agreed to meet that night. (Couchman Aff. ¶72). When Santiago asked Carlos Sanchez how much the "car part cost," Carlos Sanchez replied that "it's pretty cheap, $250.00." (Couchman Aff. ¶72). They initially agreed to meet after 8:00 p.m., but in a subsequent call, the two agreed to meet later. (Couchman Aff. ¶72). At approximately 9:30 p.m. that night, surveillance observed Santiago leaving his address at 264 Mechanic Street in the Santiago minivan. (Couchman Aff. ¶73). At approximately 9:45 p.m., surveillance observed Santiago parking the Santiago minivan in front of Sanchez's 270 Fairmont Street residence. (Couchman Aff. ¶73). Santiago exited his vehicle and was observed walking up the steps toward 270 Fairmont Street. (Couchman Aff. ¶73). At approximately 10:18 p.m. TFA Swift observed Santiago leaving the area of Carlos Sanchez's 270 Fairmont Street residence accompanied by a second Hispanic male. (Couchman Aff. ¶73). Santiago walked directly to his vehicle while the other Hispanic male looked in both directions up and down Fairmont Street. (Couchman Aff. ¶73). Based upon numerous previously intercepted conversations in which Santiago uses monetary amounts or car parts as code for quantities of heroin, the intercepted conversations and subsequent surveillance indicated that Carlos Sanchez ordered 250 grams of heroin from Santiago and that Santiago then delivered the heroin to Carlos Sanchez. (Couchman Aff. ¶74).

For another example, in a series of intercepted conversations on July 1, 2004, co-defendant Enrique Agosto ("Agosto") ordered "sixty" (meaning sixty grams of heroin) and an additional "money order" for $16.00 (an additional 16 grams of heroin). (Couchman Aff. ¶77). The following day, July 2nd, Santiago told Agosto to get ready because Santiago was waiting for Agosto to go to the "beach." (Couchman Aff. ¶79 ). Santiago instructed Agosto to take the right amount of money for the "parking." (Couchman Aff. ¶79). Santiago insisted that Agosto calculate how much and bring the right amount of money. (Couchman Aff. ¶79). Soon after this call, surveillance observed Santiago drive out of the driveway of 264 Mechanic Street in the Santiago minivan. (Couchman Aff. ¶80). Surveillance officers then followed Santiago directly to Lowell (where Agosto lived) where surveillance lost him in the area of the River Place apartment complex at approximately 8:20 a.m., but observed him again at approximately 9:05 a.m. (Couchman Aff. ¶80). At approximately 8:15 a.m. an outgoing call from Santiago to Agosto was intercepted over Target Telephone 2. During that call Santiago told Agosto he was about to leave town. (Couchman Aff. ¶80). Agosto asked Santiago to meet him at Josefina's house, Agosto's little sister. (Couchman Aff. ¶80). During further conversation Santiago told Agosto to start walking over there. (Couchman Aff. ¶ 80). Based upon the coded interceptions and surveillance, Agosto placed and order for 60 grams of heroin followed by another order for 16 grams of heroin and then, the following morning, Santiago delivered the quantities of heroin to him. (Couchman Aff. ¶81).

Before and after each of his trips to New York to his heroin supplier, Santiago left and then returned to his residence at 264 Mechanic Street. (Couchman Aff. ¶¶111-16 ). On September 15, 2004, Santiago received a telephone call from 718-598-5109 subscribed to by Jose Perez, 1241 39th Street, Brooklyn, New York (and later determined to be used by co-defendant Juan Nunez,

Santiago's heroin supplier). (DEA was not intercepting Target Telephone 3 at this time). (Couchman Aff. ¶112). The following day, September 16, 2004, the GPS device on the Santiago minivan indicated that Santiago left his residence at approximately 9:57 p.m. and traveled to 930 59th Street in Brooklyn, New York, Nunez's residence. (Couchman Aff. ¶112). Although there was no physical surveillance conducted of this trip, the GPS device indicated that the Santiago minivan stayed at Nunez's residence for approximately five hours before leaving at 2:53 a.m. and returning to 264 Mechanic Street at approximately 6:33 a.m. (Couchman Aff. ¶112). Less than two weeks later, on September 27, 2004, the GPS device on the Santiago minivan revealed that Santiago left 264 Mechanic Street at approximately 10:20 a.m. and arrived at Nunez's residence at approximately 1:45 p.m. (Couchman Aff. ¶113). Surveillance there observed Santiago arrive in the Santiago minivan and enter the 59th Street residence. (Couchman Aff. ¶113). According to pen register data on Target Telephone 3, Santiago called a pager, (917) 500-8132 at 1:47 p.m. and then received an incoming call at 1:49 p.m. from the same telephone number, 718-598-5109 used by Nunez. (Again at this time, DEA was not intercepting Target Telephone 3 at the time). (Couchman Aff. ¶113). Surveillance at Nunez's residence observed Santiago and Nunez outside together. (Couchman Aff. ¶113). Surveillance of the location continued until approximately 8:30 p.m. (Couchman Aff. ¶113). During this time, Santiago was not seen leaving the address. (Couchman Aff. ¶113). The GPS device showed that Santiago's minivan left Nunez's residence at approximately 3:00 a.m. and arrived back at 264 Mechanic Street at approximately 6:35 a.m. (Couchman Aff. ¶113).

In a October 6, 2004 call to 718-598-5109, the phone used by Nunez, a person later identified as Nunez complained to Santiago about Santiago not calling him. (Couchman Aff. ¶114). In the course of this conversation, Santiago asked him if he was "done with the factory job." (Couchman

Aff. ¶114). The male indicated that he was, more or less, and that he may be leaving for Santo Domingo the following day (meaning that he was going to his drug supplier the following day). (Couchman Aff. ¶114). The male asked Santiago if he was going to travel and Santiago said that he was going to see if he could get some vacation so he could go to Santo Domingo as well (meaning whether Santiago was going to visit his supplier and Santiago indicating that he was going to do so). (Couchman Aff. ¶114). At the end of the conversation, Santiago said that he would call the caller sometime this week if he decided to go to Santo Domingo (meaning go to his supplier). (Couchman Aff. ¶114). Although there was no surveillance of this trip, the GPS device on Santiago's minivan showed that he traveled to Nunez's residence on October 7, 2004 and then returned early the following morning to his residence at 264 Mechanic Street. (Couchman Aff. ¶114).

On October 13th, there was an intercepted call between Santiago and the caller (Nunez) from 718-598-5109. (Couchman Aff. ¶116). Santiago told Nunez that he would visit "early in the weekend." (Couchman Aff. ¶116). On October 14, 2004, the GPS device showed that the Santiago minivan drove from Massachusetts to New York. (Couchman Aff. II ¶11). Surveillance observed Santiago arrive in the Santiago minivan at Nunez's residence at 930 59th Street in Brooklyn, New York around 2:20 p.m. (Couchman Aff. ¶11).

When Santiago arrived, a male later identified as Nunez emerged from 930 59th Street carrying a small black plastic bag. (Couchman Aff. II ¶12). Nunez went to the driver's side of SANTIAGO's minivan and handed the bag to Santiago. (Couchman Aff. II ¶12). The two men had a short conversation after Nunez handed Santiago the bag. (Couchman Aff. II ¶12). Then, Nunez walked over to another car, drive off and park a short distance away. (Couchman Aff. II ¶12). When Nunez returned, Nunez went to the passenger side of the Santiago minivan and opened the sliding

door and took a garment bag out and took it into the residence. (Couchman Aff. II ¶12). Santiago followed him inside the building at 930 59th Street at approximately 2:55 p.m. (Couchman Aff. II ¶12). Santiago remained at this address until he left in the early morning hours on October 15, 2004. (Couchman Aff. II ¶¶13-15). As summarized below, this trip was the last of Santiago's trips to New York to visit Nunez and culminated in Santiago's and Nunez's arrests and the seizure of ½ kilogram of heroin from Santiago's vehicle on October 15, 2004.

**Santiago and Torres Conduct Drug Business at the Mini Self-Storage at 3 Foundry Street, Lowell, MA**

On numerous occasions during the investigation, Santiago's coded conversations with Torres about heroin sales were followed by surveillance of the two at and around Mini Self-Storage at 3 Foundry Street, Lowell, MA. (Couchman Aff. ¶¶83-88). Based upon the nature of the intercepted calls and surveillance, Santiago and Torres' meets at the Mini Self-Storage were drug-related. Id. For example, on June 30, 2004, Torres told Santiago to take 2 of the "good ones for Taylor" (meaning two fingers of heroin). (Couchman Aff. ¶83). Santiago replied they will meet 'over there' and to answer the call. (Couchman Aff. ¶83). Surveillance at 264 Mechanic Street later that morning observed Santiago drive to 3 Foundry Street, Lowell, MA , park his vehicle and enter a set of double white doors at the Mini Self Storage located there. (Couchman Aff. ¶84). Several minutes later Santiago exited the storage facility, opened the front passenger door of the blue van and then re-entered the storage facility. (Couchman Aff. ¶84). At about 12:07 p.m. Santiago and another Hispanic male simultaneously exited the storage facility. (Couchman Aff. ¶84). Santiago entered the Santiago minivan and departed while the other male entered a white Caravan (the same white van surveillance observed leaving Black Brook Drive, Torres's residence that morning) and

departed. (Couchman Aff. ¶84). For another example, in August 19, 2004 voicemail, Torres left a message asking Santiago to call 'Tim' back because he was leaving on Friday and needed the "title." (Couchman Aff. ¶85). The following day, Santiago made arrangements to meet Torres around 2 or 3:00. (Couchman Aff. ¶85). At about 2:30 p.m., surveillance at the Mini Self-Storage saw Torres and an unidentified Hispanic male standing by Torres' white Dodge Caravan. (Couchman Aff. ¶86). At about 2:58 p.m., surveillance agents observed Santiago arrive in the front of the Mini Self-storage, park and exit his van. (Couchman Aff. ¶86). Surveillance observed that upon exiting his van, Santiago was holding an unknown object in his left hand. (Couchman Aff. ¶86). Santiago was seen by surveillance meeting with Torres and the unknown Hispanic male outside the building where they shook hands. (Couchman Aff. ¶86). A short time later Santiago and Torres were seen by surveillance entering the storage building. (Couchman Aff. ¶86). The unknown Hispanic male remained outside sweeping. (Couchman Aff. ¶86). At about 3:03 p.m., surveillance agents observed a 1995 black Hyundai arrive in the parking lot of the facility. (Couchman Aff. ¶86). An individual later identified as co-defendant Luis Sanchez was driving. (Couchman Aff. ¶86 ). Luis Sanchez got out of the Hyundai carrying four Dunkin Donuts coffee cups. (Couchman Aff. ¶86). He entered the same storage building as Santiago and Torres. (Couchman Aff. ¶ 86). The unknown Hispanic male continued sweeping outside. (Couchman Aff. ¶86). At about 3:10 p.m., surveillance agents observed Luis Sanchez enter the Hyundai. (Couchman Aff. ¶86). At about 3:19 p.m., the unknown Hispanic male and Torres were seen getting into the white Caravan. (Couchman Aff. ¶86). They got out of the van shortly thereafter. (Couchman Aff. ¶86). At about 3:54 p.m., surveillance observed Santiago depart the area. (Couchman Aff. ¶86).

For a third example, in a September 1, 2004 call, Santiago asked Torres if he should go to

the "registry" (meaning deliver heroin) the following morning to meet up with Torres. (Couchman Aff. ¶87). Santiago asked Torres if he should bring Torres the "car" and Torres said yes. (Couchman Aff. ¶87). Santiago told Torres that the two would talk in the morning. (Couchman Aff. ¶87 ). On the following morning, September 2, 2004, Santiago told Miranda that he wanted to go there (to Miranda's location) to "fill out some papers." (Couchman Aff. ¶109). Miranda agreed. (Couchman Aff. ¶109). Santiago advised Miranda that it "may take sometime." (Couchman Aff. ¶109 ). Surveillance agents observed Santiago arrive at Miranda's residence at approximately 7:04 p.m. (Couchman Aff. ¶109). Santiago remained at Miranda's residence until approximately 8:34 p.m. (Couchman Aff. ¶109). During this time period, Santiago arranged via Target Telephone 1 for several of the other Target Subjects to meet him there, including Torrado, Torres, and Rodriguez. (Couchman Aff. ¶109). Agents were able to observe as each of these individuals came and left. (Couchman Aff. ¶109). In course of intercepted calls that day, September 2, 2004, about where and when to meet, Torres asked Santiago where they were going to meet if Santiago went today since "that place up there is bad" (meaning the Mini Self-Storage facility). (Couchman Aff. ¶ 88). Subsequently intercepted calls and surveillance that day revealed that instead of meeting at the Mini Self-Storage facility, Santiago and Torres met at Miranda's residence at 212 Wilder Street and that Miranda, who was sweeping the driveway outside at the time was doing so in an attempt to maintain countersurveillance of Santiago's drug transactions. (Couchman Aff. ¶109).

Less than one week before the search warrant for Mini Self-Storage was authorized, on October 9, 2004, there were intercepted calls between Santiago and Torres about meeting the next day. (Couchman Aff. ¶28). Later that day, however, the GPS device on SANTIAGO's minivan revealed that it had traveled to the Mini Self-Storage location and had remained there approximately

seven minutes. (Couchman Aff. ¶28).

**Miranda's Residence at 212 Wilder Street Continued to Be Used for Drug Transactions**

Even prior to Santiago and Torres using Miranda's residence at 212 Wilder Street on September 2nd as an alternative site to their meeting place at the Mini Self-Storage facility to conduct drug business, Miranda's residence had been used for drug-related meetings. (Couchman Aff. ¶¶107-08). For example, on the morning of August 27, 2004, surveillance observed Santiago arrive there, park and then walk up the exterior stairs to the second floor of 212 Wilder Street. (Couchman Aff. ¶99). There, Santiago placed a small brown paper bag on the chair at the top of the stairs before moving a barbeque grill and bending over to retrieve an item from under the grill's wheel. (Couchman Aff. ¶99). Santiago then picked up the brown paper bag, opened the front door to the second floor apartment using the keys and entered the apartment. (Couchman Aff. ¶99). On August 27, 2004, at approximately 5:51 p.m., Miranda used Target Telephone 4 to call Santiago on Target Telephone 1. (Couchman Aff. ¶108). During this conversation, Santiago told Miranda that he had gone there (to Miranda's residence) and had "left some papers" in the room that Miranda was painting. (Couchman Aff. ¶108). Santiago told Miranda that he had done so, because Miranda had told Santiago earlier that there were police around there ready to give Santiago a "ticket." (Couchman Aff. ¶108). Santiago also told Miranda that he had left Miranda's house on foot, and that the police had followed him. (Couchman Aff. ¶108). Santiago repeated that he left the "papers" in the closet behind the stereo, behind some shoes. (Couchman Aff. ¶108). Miranda replied that it was "no problem" because he was going there right away. (Couchman Aff. ¶108). Based upon the intercepted conversations and surveillance, when Santiago said "papers," he was actually referring to drugs or drug proceeds that he had left at Miranda's residence. (Couchman Aff. ¶108).

On September 1, 2004 at 6:42 p.m. Torrado told Santiago said that tomorrow was a sure thing as he just talked to the people who are going to pay him for the "tickets" for the game on Saturday. (Couchman Aff. ¶100). Santiago told Torrado to call him the following day in the afternoon. (Couchman Aff. ¶100). Torrado added that "5 or 6 guys who want to play will go up there tomorrow." (Couchman Aff. ¶100). The following afternoon, Santiago agreed to meet at 7 p.m. (Couchman Aff. ¶101). During this call, Torrado states that "five (5) guys want to play" (Torrado ordering 5 fingers, or 50 grams, of heroin). (Couchman Aff. ¶101). In a 7:04 p.m. call, Santiago told Torrado that he was waiting for Torrado at the same place where Torrado went before. (Couchman Aff. ¶102).

At or about the same time, surveillance saw Santiago park in the driveway of 212 Wilder Street. (Couchman Aff. ¶103). At approximately 7:28 p.m. Torrado was seen arriving and parking one block away from the Wilder Street residence and then walking to the driveway of 212 Wilder Street. (Couchman Aff. ¶103). At 7:37 p.m. Torrado was observed by surveillance leaving 212 Wilder Street. (Couchman Aff. ¶103). In a subsequent call at 7:44 p.m., Santiago asked Torrado if everything was okay and Torrado said everything was fine. (Couchman Aff. ¶104).

During the end of a October 3, 2004 call, Miranda told Santiago that he could stop by and that Miranda had "the key to the car that he needed" (referring to a quantity of money or drugs). (Couchman Aff. ¶110). In the course of a later conversation that day, it was clear that the two were planning to meet. (Couchman Aff. ¶110). Santiago asked Miranda if he can come over "if the coast is clear." (Couchman Aff. ¶110). Miranda replied that it was clear, that he looked but hadn't gone back outside, but he was going over. (Couchman Aff. ¶110). Santiago told Miranda that he was parking around the corner. (Couchman Aff. ¶110). The GPS device on Santiago's minivan revealed

that he was on West Adams Street in Lowell which is around the corner from Miranda's residence at this time. (Couchman Aff. ¶110).

**Arrest of Santiago, Miranda, Torres and Execution of Search Warrants at 264 Mechanic Street, 212 Wilder Street and Mini Self-Storage on October 15, 2004**

At approximately 2:20 a.m. on October 15, 2004, surveillance observed Santiago and Nunez exit the building at 930 59th Street in Brooklyn, NY where Nunez resided. (Couchman Aff. II ¶14). Surveillance observed that Santiago was not carrying anything, but Nunez was carrying the same garment bag that Nunez had taken from the Santiago minivan when Santiago had arrived. (Couchman Aff. II ¶14). Santiago went to driver's side of the Santiago minivan and got in. (Couchman Aff. II ¶14). Nunez went to the passenger's side and opened the sliding door, put the garment bag inside and then shut the door. (Couchman Aff. II ¶14). Nunez then got into the front passenger seat. (Couchman Aff. II ¶14). The two men sat in the vehicle for approximately five minutes. (Couchman Aff. II ¶14). To surveillance, it looked like they were manipulating something in front seat area. (Couchman Aff. II ¶14). Then, Nunez got out and went back into the building. (Couchman Aff. II ¶14). Santiago drove away and surveillance agents followed. (Couchman Aff. II ¶14). SANTIAGO's minivan headed east on the Brooklyn Queens Expressway and exited the highway at the Manhattan Bridge exit. (Couchman Aff. II ¶15). Shortly thereafter, agents stopped the Santiago minivan and arrested Santiago. (Couchman Aff. II ¶15). Santiago was carrying Target Telephone 3 in his pocket. (Couchman Aff. II ¶15).

Pursuant to a search warrant, the agents then conducted a search of the Santiago minivan. (Couchman Aff. II ¶16). The search uncovered approximately 500 grams of heroin wrapped in a black plastic bag inside a hidden compartment in the portion of the dashboard where the passenger-

side airbag usually is located. (Couchman Aff. II ¶16). Another cellular telephone was also found in this location. (Couchman Aff. II ¶16).

Later in the morning of October 15, 2004, five federal search warrants were executed in Massachusetts at 264 Mechanic Street (Santiago's residence); 212 Wilder Street (Miranda's residence); Mini Self-Storage (unit leased by Torres); and two other locations associated with co-defendants in this matter--235 Eighteenth Street, Apartment 204, Dracut, Massachusetts (Rivera's residence) and 270 Fairmount Street, Apartment 1F, Fitchburg, Massachusetts (Carlos Sanchez's residence). The search warrants for 264 Mechanic Street and the Mini Self-Storage facility authorized search and seizure of heroin; drug packaging, processing and distribution materials; electronic pagers and cellular telephones used to communicate with drug associates; books, records, notes, ledgers and any other papers and records relating to the drug distribution; cash and currency and other items of value made or derived from drug trafficking; documents reflecting occupancy, dominion and/or control of the locations; documents or other evidence reflecting Santiago's dominion and control over tangible assets; and photographs of individuals, property and/or illegal controlled substances. (Exhibits 3 and 5). The search warrant for 212 Wilder Street authorized the search and seizure of heroin; drug packaging, processing and distribution materials; electronic pagers and cellular telephones used to communicate with drug associates; and cash and currency and other items of value made or derived from drug trafficking. (Exhibit 4).

At 264 Mechanic Street, law enforcement agents seized items including but not limited to Target Telephone 2, seven fingers (or 70 grams) of heroin, a 9 mm firearm, three firearm silencers and various items relating to the processing and packaging of heroin including two, digital scales, a steel press, money counter, 2 steel finger press molds and grinder. (Exhibit 3). At Miranda's

residence at 212 Wilder Street, agents seized items including but not limited to four cellular telephones including Target Telephone 4 and several items used in the processing of controlled substances--a bottle of inositol powder, dust masks, rubber gloves and goggles. (Exhibit 4). At the Mini Self-Storage, agents found a scale, drug packaging materials including baggies with "It's Hot" red devil markings, spoons, sandwich baggies and drug wrappings and miscellaneous papers in storage bin J1 and found miscellaneous papers including papers in the name of Torres and "Coqui" (Torres's alias) in the lower garage storage area. (Exhibit 5; Exhibit 6).

## Argument

### I. AGENTS DID KNOCK AND ANNOUNCE BEFORE ENTERING 212 WILDER STREET TO EXECUTE THE SEARCH WARRANT ON MIRANDA'S RESIDENCE (GOVERNMENT REQUESTS EVIDENTIARY HEARING ON MIRANDA'S MOTION)

The Court should deny Miranda's motion to suppress the evidence seized at 212 Wilder Street, Lowell, Massachusetts since the law enforcement agents complied with their duties to knock and announce under 18 U.S.C. §3109. Section 3109 provides that an "officer may break open any outer or inner door or window of a house, or anything therein, to execute a search warrant, if, after notice of his authority and purpose, he is refused admittance or when necessary to liberate himself or a person aiding him in the execution of the warrant." The phrase "refused admittance" can be a constructive refusal based upon a lack of response to the knocking and announcing. United States v. Garcia, 983 F.2d 1160, 1168 (1st Cir. 1993) (forced entry was justified when police knocked, loudly announced authority and purpose and waited ten seconds because contraband could have been quickly disposed of by suspect). Although Miranda (and his fellow resident, Paula Llanos, who was the subscriber of Target Telephone 4 used by Miranda) have submitted affidavits in support of his motion claiming that the agents who executed the warrant on the morning of October 15, 2004 did

not knock and announce their presence before entering the 212 Wilder Street residence, these claims are contradicted by the law enforcement agents. Attached hereto (as Exhibit 7) is a copy of a DEA report regarding the execution of the search warrant at 212 Wilder Street. As this report reveals (and as anticipated testimony from law enforcement agents at the evidentiary hearing will reveal), the agents gained entry into Miranda's residence "[a]fter knocking and announcing their presence." Although not specifically mentioned in the DEA report,[4] undersigned counsel anticipates that there will be testimony from several law enforcement officers at the evidentiary hearing that Massachusetts State Police Lieutenant Gregory Dern knocked on one of the doors to the residence and announced the police presence in a loud and clear voice.

Not only did the agents knock and announce their presence, they waited a reasonable amount of time before forcibly opening the door and entering 212 Wilder Street when they received no response to their knocking and announcing. Undersigned counsel also anticipates that there will be testimony from several law officers that there was an interval of 20 seconds or more before they entered the residence after Lieutenant Dern knocked and announced. Significantly, "there is no bright-line rule regarding the length of time the police must postpone a forced entry following their announcement; instead, each case is to be assessed on the totality of its circumstances." United States v. Antrim, 389 F.3d 276, 279 (1st Cir. 2004); United States v. Schenk, 983 F.2d 876, 879 (8th Cir. 1993); see United States v. Sargent, 319 F.3d 4, 11 (1st Cir. 2003).[5] The First Circuit and other

---

[4]The author of the DEA report regarding the execution of the search warrant, DEA Special Agent Willoughby, was at another entrance to 212 Wilder Street. As testimony at the evidentiary hearing will reveal, once the agents at the other entrance knocked and announced and subsequently entered the residence, they let Special Agent Willoughby into the residence.

[5]There are, however, exceptions to compliance with the knock and announce rule. In exigent circumstances involving a danger to the agents or when "specific evidence existed that a

courts have found delays of various lengths to have been permissible for Fourth Amendment purposes. See, e.g., Antrim, 389 F.3d at 280-81 and cases cited (concluding that, based upon totality of circumstances, the officers did not violate knock and announce requirement after waiting 25 to 40 seconds before effecting their forced entry; collecting cases regarding brief delays in the 15-to-20 second range or less in fairly typical drug cases); Garcia, 983 F.2d at 1168 (holding that "[u]nder the circumstances [drug raid], a wait of ten seconds after knocking combined with an announcement before forced entry, was reasonable"). Most recently, the First Circuit has held that circumstances may warrant a delay as short as five seconds between knocking and announcing and entering a location to be searched. Sargent, 319 F.3d at 10 (holding that a five-second delay between knocking and announcing and entering was reasonable since the officers had "reasonable suspicion that their safety would be threatened by further delay" where defendant was "an active drug dealer with a substantial stock of drugs and weapons at hand, there was adequate reason to think the knives were intended to convey a message that Sargent would protect himself and his drugs").

The agents had not only a warrant to search Miranda's residence, they also had a warrant to arrest Miranda for conspiracy to distribute heroin. The investigation had revealed that Miranda was a drug associate of Santiago's and that on several occasions, Santiago used Miranda's 212 Wilder Street residence as a place to meet with some drug customers and deliver heroin and, on at least one

---

suspect was aware of the presence of police and was engaged in flight or the destruction of evidence," law enforcement agents may be excused from complying with the rule. United States v. Hidalgo, 747 F. Supp. 818, 829 (D. Mass. 1990); see Richards v. Wisconsin, 520 U.S. 385, 394 (1997) (rejecting Wisconsin's blanket exception to the knock-and-announce requirement, but ruling that there were circumstances in which police could justify a "no-knock" entry: "[t]he police must have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence")

of these occasions, surveillance observed Miranda serving as a "lookout" to detect any law enforcement surveillance. The search warrant authorized by the Court had authorized to search for heroin; paraphernalia for packaging, processing and distribution of controlled substances such as heroin, including but not limited to, packaging materials and scales; and electronic pagers and cellular telephones used to communicate with drug associates. Although the agents were executing the warrants early in the morning (at approximately 6:05 a.m.), they had reason to believe that there was risk of destruction of evidence (namely, heroin) and/or flight by the defendant. Undersigned counsel anticipates testimony at the evidentiary hearing while the agents were waiting outside of 212 Wilder Street to execute the search warrant they observed the lights inside the residence go on and off several times. "The fact that the underlying crime involved drug distribution–while not itself conclusive–nonetheless tends to lessen the delay the officers reasonably were required to allow following their announcement and prior to their forced entry." Antrim, 389 F.3d at 280. Given the agents' observations that morning and the information that had been gathered in the course of the investigation regarding Miranda's role in drug trafficking, the length of the interval between the knocking and announcing was reasonable and proper. The government anticipates that at the evidentiary hearing that both parties have sought regarding Miranda's motion, the Court will find that the agents complied with their duty to knock and announce and waited a reasonable period of time before entering Miranda's residence to execute the search warrant and arrest warrant authorized by this Court.

## II. THERE WAS A SUFFICIENT NEXUS BETWEEN SANTIAGO'S DRUG DISTRIBUTION AND HIS RESIDENCE AT 264 MECHANIC STREET

### A. There was a substantial basis upon which the magistrate judge could determine that there was a sufficient nexus between Santiago's criminal conduct and his residence at 264 Mechanic Street.

Before issuing a search warrant, a magistrate judge must find probable cause to believe that the defendant has committed a crime -- "the commission element" -- and that enumerated evidence relevant to the probable criminality likely is located at the place to be searched -- "the 'nexus' element". United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996). To satisfy this "probable cause" standard, the totality of the circumstances disclosed in the supporting affidavit must demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. 213, 238 (1983); United States v. Bucuvalas, 970 F.2d 937, 940 (1st Cir. 1992), cert. denied, 507 U.S. 959 (1993).

It is well settled that the review of an issuing magistrate judge's probable cause determination is deferential. "Reflecting this preference for the warrant process, the traditional standard for review of an issuing magistrate's probable cause determination has been that so long as the magistrate had a 'substantial basis...conclud[ing]' that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more. Gates, 462 U.S. at 236 (quotation omitted). Accordingly, the reviewing court, here the district court, must accord "considerable deference" to the determination of probable cause by the magistrate judge. See Zayas-Diaz, 95 F.3d at 111; see also United States v. Taylor, 985 F.2d 2, 5 (1st Cir. 1993). The reviewing court must examine the affidavit in a practical, common sense fashion, and accord considerable deference to reasonable inferences the issuing magistrate may have drawn from the facts presented in the sworn affidavit. Bucuvalas, 970

F.2d at 940; see United States v. Jewell, 60 F.3d 20, 23 (1st Cir. 1995) (citing the totality of the circumstances test and rejecting the defendant's invitation to "engage in a piecemeal examination of the affidavit," and to base review on "bits and pieces of information in isolation"). The inquiry is whether the magistrate judge had a "substantial basis" for concluding that probable cause existed. United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999) (quoting Taylor, 985 F.2d at 6); United States. v. Whitner, 219 F.3d 289, 291-92 (3rd Cir. 2000) (quoting Gates, 462 U.S. at 238).

In arguing that the Couchman Affidavit was insufficient to establish probable cause for the items enumerated in the search warrant, Santiago attempts to direct the Court to isolated sections of the Couchman Affidavit to argue search warrant affidavit failed to show such a nexus. "[S]tatements in an affidavit may not be read in isolation–the affidavit must be read as a whole." United States v. Conley, 4 F.3d 1200, 1206 (3rd Cir. 1993); see Gates, 462 U.S. at 232 ("probable cause is a fluid concept–turning on the assessment of probabilities in particular factual contexts–not readily, or even usefully, reduced to a neat set of legal rules").

The suggestion that there was no evidence of a connection between Santiago's drug dealing and his residence at 264 Mechanic Street belies the circumstances of the investigation of his heroin transactions and the facts (and the reasonable inferences that could be drawn from those facts recited in the Couchman Affidavit). As summarized above and recited in more detail in the Couchman Affidavit, the investigation revealed that Santiago was distributing heroin to numerous customers in the Leominster/Lowell area; that he would receive drug orders and otherwise facilitate his drug distribution by using his telephones, Target Telephones 1, 2, and 3 and his pager, Target Pager; that he had delivered heroin to Jose Rodriguez on June 6, 2004 (60 grams); to Rivera's vehicle on June 7, 2004 (20 grams); and to Torrado (via Torrado's pickup from Santiago's vehicle) in August 2004

(10 grams) that was subsequently seized; and that Santiago as receiving heroin from a supplier in New York (later identified as Nunez) on several occasions in September and October 2004. Throughout this investigation, Santiago was residing at 264 Mechanic Street. He was observed leaving from his residence on numerous occasions when intercepted calls and subsequent surveillance revealed that he was meeting drug customers to make delivery of heroin; and he was observed returning from similar meetings with drug customers after previously intercepted calls and surveillance. Significantly, the GPS device on the Santiago minivan revealed that Santiago left from his 264 Mechanic Street residence to travel to his New York source of supply in September and October 2004 including his last trip on October 14, 2004. Although there was no direct observation that any drug transactions took place inside Santiago's residence (as there would unlikely to be given that his residence is private property that the agents would not have access to without a warrant), the fair and reasonable inference is that Santiago stored items related to his drug business there. "The nexus between the objects to be seized and the premises searched need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items such, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime]....'" Feliz, 182 F.3d at 87-88 (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)).

All of this evidence suggests, at a minimum, that Santiago was storing heroin (that he received from his New York supplier and that he held for his drug customers) at his residence and was storing money that he received from his customers for drugs there as well. There was also a reasonable inference that he would also store drug paraphernalia and other drug-related items there as well. Although there is no per se probable cause to search a drug suspect's residence, it is well

settled that "[e]vidence of involvement in the drug trade is likely to be found where the dealers reside." Whitner, 219 F.3d at 297-98 (collecting cases); see, e.g., Feliz, 182 F.3d at 88.[6] Taking a commonsensical approach to the facts presented in the affidavit, the totality of circumstances presented in the search warrant clearly show that there was a substantial basis for concluding that heroin, drug paraphernalia and all the other items enumerated in the search warrant would be found there.

In addition to the ample evidence regarding the nexus between Santiago's drug business and his residence, Special Agent Couchman, based upon her training and experience during nineteen

---

[6]In Feliz, for example, the First Circuit was satisfied that the "nexus" element had been proven based on facts in the affidavit from which a reasonable inference could be drawn "as to the probable presence of incriminating evidence at Feliz's apartment." Id. at 87. On this point, the Court was swayed by evidence that the defendant was an experienced drug trafficker and, therefore, likely to possess incriminating documents and drug money "in some safe yet accessible place", and that "no other residence or drug dealing headquarters of his" was mentioned in the affidavit. Id. at 87-88. Based on the foregoing, the Court reasoned:

> If he did not maintain his accounts and records, and the presumably large sums of money received in the course of his dealings, at his apartment, where else would he keep them?...[W]e do not suggest that, in all criminal cases, there will automatically be probable cause to search a suspect's residence....we say only that interpreting a search warrant affidavit in the proper commonsense and realistic fashion,...may result in the inference of probable cause to believe that criminal objects are located in a particular place, such as a suspect's residence to which they have not been tied to by direct evidence.

Id. at 88 (citations omitted). As such, it is logical to infer that, in addition to items evidencing his dominion and control over the apartment, a drug dealer, like Santiago, would keep items related to his drug trade at his residence. See United States v. Thomas, 989 F.2d 1252, 1254-55 (D.C. Cir. 1993) (concluding that "observations of illegal activity occurring away from the suspect's residence, can support a finding of probable cause to issue a search warrant for the [defendant's] residence, if there is a reasonable basis to infer from the nature of the illegal activity observed that relevant evidence will be found in the residence"); United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986)(recognizing that in the case of drug dealers, evidence is likely to be found where the dealers live).

years as a DEA agent, provided information about the practices of drug distributors in regard to the storage and security of drugs, drug money and drug-related items. Specifically, Special Agent Couchman attested in her affidavit, among other things, that it is common for drug traffickers to hide contraband, proceeds of drug sales, records of drug transactions, weapons, ammunition, caches of drugs, large amounts of currency and other items relating to their trafficking activities "in secure locations within residences for ready access and to conceal them from law enforcement authorities"; narcotics traffickers usually keep paraphernalia for packaging, cutting, weighing and distributing controlled substances; and they often frequently build "stash" locations within their residences or other locations in order to store illicit narcotics substances as well as other item related to their drug trafficking. (Couchman Aff. ¶¶119d, 119i, 119l). United States v. Caicedo, 85 F.3d 1184, 1192 (6th Cir. 1996) (quoting United States v. Lawson, 999 F.2d 985, 987 (6th Cir. 1993) ("[t]he issuing judge or magistrate 'may give considerable weight to the conclusions of experienced law enforcement officers regarding where evidence of a crime is likely to be found' and 'is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of offense's"). As Santiago concedes (Santiago Mem., p. 1), Special Agent Couchman has sufficient training and experience to provide such information about the practices of drug traffickers. Moreover, the Couchman Affidavit in this regard was not mere boilerplate as it contained information regarding drug dealers based upon the agent's training and experience and was coupled with detailed information about Santiago's drug dealing and its nexus to his residence.

**B. Although the magistrate judge had a substantial basis from which to conclude that probable cause existed to search 264 Mechanic Street, even assuming *arguendo*, that there was no such substantial basis, the good faith exception under *Leon* would apply.**

Even if the Court were to find that the Affidavit failed to establish probable cause to search

264 Mechanic Street, the evidence seized there should not be suppressed under United States v. Leon, 468 U.S. 897 (1984). Since no deterrent purpose is served by sanctioning "objectively reasonable" law enforcement conduct, the "extreme sanction" of exclusion is inapplicable to evidence seized pursuant to a search warrant obtained in an "objectively reasonable" manner from a neutral magistrate, even assuming the warrant or supporting affidavits were defective. Leon, 468 U.S. at 922, 926; Zayas-Diaz, 95 F.3d at 113; United States v. Ricciardelli, 998 F.2d 8, 15 (1st Cir. 1993). With the issuance of a search warrant, "exclusionary rule" deterrence is appropriate in certain, limited circumstances where: "(1) the magistrate is 'misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth'; (2) the magistrate 'wholly abandon[s] his [detached and neutral] judicial role'; (3) the warrant is 'so facially deficient [e.g., failing to list, with sufficient particularity, the evidence to be seized] ... that the executing officers cannot reasonably presume it to be valid'; or (4) the supporting affidavits is 'so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable.' " Zayas-Diaz, 95 F.3d at 113 (quoting Leon, 468 U.S. at 923). None of these circumstances are presented in this case.

The Couchman Affidavit and the search warrant are within the bounds of the Leon good faith exception. Nothing in the Affidavit or in the record or in Santiago's Memorandum suggests that the Court (Collings, M.J.) was misled by information contained in the affidavit that the affiant either knew was false or should have known was false. Cf. United States v. Vigeant, 176 F.3d 565, 572 (1st Cir. 1999)(good faith exception inapplicable because of material omissions and false and misleading statements contained in affidavit); Ricciardelli, 998 F.2d at 16 (officers' failure to disclose fact that package might not even be delivered to premises in affidavit for anticipatory search

warrant led to subsequent invalidation of the warrant). Likewise, there is no evidence to suggest that Judge Collings "wholly abandoned" his judicial role as a neutral and detached magistrate when he signed/authorized the search warrant application. Leon, 468 U.S. at 923.

Finally, it cannot be said that the Affidavit was either "so lacking in indicia of probable cause" or "so facially deficient i.e. in failing to particularize the place to be searched or the things to be seized," that even the affiant should have realized that probable cause was a reach or that the warrant was patently invalid. Leon, 468 U.S. at 923. On the contrary, the Couchman Affidavit was prepared and presented in a thorough and detailed manner. It contained inculpatory evidence developed from an ongoing law enforcement investigation involving evidence from numerous sources including but not limited to interceptions of wire communications over numerous telephones including phones used by Santiago in his heroin distribution business, and surveillance. The affidavit did not include mere conclusory statements, but a detailed summary of an ongoing law enforcement investigation of Santiago, his associates and his drug distribution business that permitted Judge Collings to find probable cause to search 264 Mechanic Street.

Assuming *arguendo*, however, that the Court finds that probable cause was lacking to search 264 Mechanic Street, the government contends that the good faith exception under Leon justifies preservation of any evidence seized. A well-trained law enforcement officer reasonably could have relied upon the Couchman Affidavit as adequate support for the issuing magistrate's finding that there was a fair probability that the enumerated items would be located at 264 Mechanic Street. Zayas-Diaz, 95 F.3d at 116.

For all of the aforementioned reasons, the Court should deny the motion on the pleadings and without an evidentiary hearing. See United States v. Lewis, 40 F.3d 1325, 1332 (1st Cir.

1994)(affirming district court's refusal to hold an evidentiary hearing where the factual matters were essentially uncontested).

## III. THE ITEMS SEIZED FROM STORAGE UNIT J1 AT MINI SELF STORAGE SHOULD NOT BE SUPPRESSED (GOVERNMENT REQUESTS EVIDENTIARY HEARING ON TORRES' MOTION)

In seeking to suppress the evidence seized from Storage Unit JI at the Mini Self-Storage facility on October 15, 2004, Torres argues that the search of Storage Unit J1 was beyond the scope of the search warrant and, despite Torres's disavowing any knowledge of any storage unit there and his daughter voluntarily providing the keys to this location, the search and seizure of items from this location was improper. Given the totality of circumstances, the items seized from Unit J1 should not be suppressed.

The search warrant for the Mini Self-Storage facility included a description of the area there to be searched:

> The first floor of the storage building located at Mini Self-Storage, 3 Foundry Street, Lowell, Massachusetts is located in the left rear portion of the Mini Storage lot. It is located in a two story building with dark colored metal siding on the front of the building with white clapboard siding on the end of the building. A blue and white sign with the words, Mini Self-Storage Tel 978-453-8206, printed on it, is located on the top right corner of the side of the building. The entrance to the first floor is located on the right end of the building as viewed from Foundry Street. The entrance consists for a set of solid white double doors. There are no numbers printed on the doors.

(Exhibit 5). The search warrant also included three photographs of the structure that contained the area to be searched. (Exhibit 5). Two of these photographs showed a structure with the Mini Self -Storage sign and an entrance consisting of a set of sold white double doors on the right end of the

building consistent with the written description above. (Exhibit 5). [7]

On the morning of October 15, 2004, law enforcement agents including Task Force Agent Kevin Swift went to the residence of Edwin Torres at 219 Blackbrook Drive, Lowell, Massachusetts to arrest him pursuant to the federal arrest warrant that had been issued by this Court. (A copy of a DEA report regarding Torres's arrest is attached hereto as Exhibit 6). There, they encountered Torres, Elizabeth Alvarado (Torres' companion) and Yasenia Torres (Torres' daughter). Torres was placed under arrest, advised of the charges against him and his Miranda rights. (Exhibit 6). Torres provided verbal consent to a search of his vehicle and a search was subsequently conducted of this vehicle, but no items were seized from it. (Exhibit 6). Torres also verbally consented to a search of the upstairs bedroom. As a result of the search of this location, agents seized two cellular telephones. (Exhibit 6). While at the 219 Blackbrook Drive residence, Task Force Agent Swift informed Torres that the rented storage space on Foundry Street in Lowell, Massachusetts was going to be the subject of a search warrant and requested the keys to this space. Undersigned counsel anticipates that TFA Swift will testify that he sought the keys so that the agents could access Mini Self-Storage without damaging it. Torres denied knowledge of any storage space. (Exhibit 6). However, his daughter Yasenia Torres stated that the only items in the storage space were furniture and clothes that belonged to Elizabeth Alvarado. (Exhibit 6). She then identified the key ring containing keys to the storage space. (Exhibit 6). TFA Swift subsequently gave them to TFA Brian Proulx who conducted the search of Mini Self-Storage. (Exhibit 6).

---

[7] The government notes, however, that the search warrant also included a third photograph of a building with a door that had a sign above it marked "Jade." (Exhibit 5). This building was also located on the site of Mini Self-Storage and the Storage Unit J1 was located inside, but it was a building separate from the building described in the written description in the search warrant or as depicted in the two other photographs incorporated into the search warrant.

Task Force Agent Proulx and other law enforcement agents subsequently conducted a search of Mini Self-Storage. (A DEA report regarding this search is also attached hereto as Exhibit 6). The agents used the keys to open the double white doors of the space located in the building with the Mini Self-Storage sign. There, the agents seized miscellaneous documents, papers and bills containing various names including Torres's name and "Coqui" (Torres's alias). (Exhibit 6).[8] The agents also searched storage area J1 using another key on the key ring to access this space. (Exhibit 6). J1 was located in a building separate from the one with the Mini Self-Storage sign. JI was located in the building accessible through the door with the "Jade" sign over the door as depicted in the third photograph attached to the search warrant. (Exhibit 6). In J1, the agents seized a scale, drug packaging materials and an envelope containing a lease agreement, bills and miscellaneous paperwork with various names including but not limited to Coqui Softball Team. (Exhibit 6).

As an initial matter, Torres has failed to assert standing to challenge the search of Unit J1. By "standing," the government is using the shorthand that the First Circuit has used to refer to the requisite threshold showing that a defendant has to make that he had reasonable expectation of privacy in the premises of the search that he seeks to suppress. United States v. Lewis, 40 F.3d 1325, 1333 & n. 1 (1st Cir. 1994); United States v. Kimball, 25 F.3d 1, 5 & n. 1 (1st Cir. 1994). The defendant bears the burden on this issue and "[a] defendant who fails to demonstrate a sufficiently close connection to the relevant places or objects will not have standing to claim that they were illegally searched or seized." Lewis, 40 F.3d at 1333 (holding that the defendants lacked standing to contest the search of a parking lot because they failed to assert any privacy interest in the seized

---

[8]The government notes that Torres has not moved to suppress the items seized from this location. He has only moved to seize the items seized from Storage area J1.

contraband); United States v. Mancini, 8 F.3d 104, 107 (1st Cir. 1993). In connection with his motion to suppress, Torres has not filed an affidavit or otherwise asserted his reasonable expectation of privacy in storage unit J1. To the contrary, the only statement that Torres has made in connection with Mini Self-Storage was his statement to the agents on October 15, 2004 claiming that he had no knowledge of storage space there. (Exhibit 6).[9] Accordingly, this Court should not even reach the merits of Torres' motion to suppress since he has failed to make this requisite threshold showing.

Even assuming *arguendo* that the search of Unit J1 was beyond the scope of the search warrant,[10] the agents had implied consent from Torres' daughter to search. For a consent search, there must be a showing that consent was given voluntarily. Schneckloth v. Bustamonte, 412 U.S. 218, 248 (1973). The question of whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of the circumstances." United States v. Luciano, 329 F.3d 1, 7 (1st Cir. 2003) (quoting

---

[9]Certainly, Torres cannot have it both ways. He cannot disclaim interest in storage space at Mini Self-Storage and also assert a privacy interest in the contents of same.

[10]The government acknowledges that the location described in the written description in the search described in the search warrant does not cover the J1 area located in a separate building at the Mini Self-Storage site. Accordingly, the government flagged this issue as information that counsel might consider discoverable under Local Rule 116.2(B)(1)(b) (i.e., information that would cast doubt on the admissibility of evidence that the government anticipates offering in its case-in-chief and that could be subject to a motion to suppress or exclude) in its automatic discovery letter. The fact that the photographs attached to and incorporated into the search warrant included a photograph with the building with "Jade" sign over the door (in which storage area J1 was located), at minimum, gave the agents a good faith basis for believing that the search warrant covered the building in which J1 was located. See discussion, supra, at pp. 30-32 regarding Leon good faith exception; see also United States v. Asselin, 775 F.2d 445, 447 (1st Cir. 1985) (good faith exception under Leon applies to the agents' interpretation of the scope of the search allowed pursuant to a search warrant).

Schneckloth, 412 U.S. at 227). Given the totality of circumstances, Yesenia Torres provided consent to search the storage units–both the unit behind the double white doors and the storage area J1–by identifying the key ring for the agents. The nonverbal act of providing keys to a space can be implied consent to search that space. See, e.g., United States v. Gutierrez, 92 F.3d 468, 471 (7th Cir. 1996) (holding that the defendant had consented to search of the truck he was driving when he handed the keys to same to the agents); United States v. Mallory, 460 F.2d 243, 247 (10th Cir. 1972) (driver giving keys to ignition of car was thereby consenting to search of vehicle); Robinson v. United States, 325 F.2d 880, 884 (5th Cir. 1964) (ruling that the defendant's act of giving his car keys to the agent when the agent told him that he wanted to search the car amounted to consent). Moreover, although Torres denied any knowledge of or connection to Mini Self-Storage, his daughter informed the agents that the storage space contained items belonging to Elizabeth Alvarado and identified the key ring containing the keys to Mini Self-Storage. This ring contained the keys not only to space in the building with the Mini Self-Storage sign on it, but the building access through the door under the "Jade" sign in which storage area J1 was located. The agents also had an objectively reasonable basis for concluding that Yesenia Torres, a close family member of Torres, had authority to consent to the search. United States v. Meada, 2005 WL 1208128, *4 (1st Cir. May 23, 2005) (holding that a third party with common authority over apartment could consent to a search and "[e]ven if a person does not in fact have such authority, police may rely on her consent if they reasonably believe that she has such authority; distinguishing Illinois v. Rodriguez, 497 U.S. 177, 186 (1990)). Although the agents mentioned the existence of a search warrant for Mini Self-Storage, Yesenia Torres was not merely acquiescing to law enforcement authority as Torres has argued in his motion citing Bumper v. North Carolina, 391 U.S. 543 (1968). As this court has recognized, "[t]he analytic

standard that the Supreme Court set forth does leave room for the possibility of consent, even after possession of a search warrant has been announced." United States v. Zygarowski, 724 F. Supp. 1052, 1056 (D. Mass. 1989) (emphasis added) (holding that defendant had voluntarily consented to an expansion of the agents' search beyond the scope of the search warrant). Even in such a scenario, a search is permissible if the consent was freely and voluntarily given as it was in this case. Accordingly, if the Court even reaches the merits of Torres' motion, it should deny the motion to suppress the seizure of items from storage area JI.

**Conclusion**

For all of the aforementioned reasons, the government respectfully requests that the Court deny the motions to suppress evidence filed by Defendants Julio Santiago, Pedro Alberto Miranda (a/k/a Carlos Colon) and Edwin Torres, respectively.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By: ______________________
DENISE JEFFERSON CASPER
Assistant U.S. Attorney
(617) 748-3120

CERTIFICATE OF SERVICE

This is to certify that I have this day served the foregoing document (with attachments) upon counsel of record by depositing in the United States mail a copy of same in an envelope bearing sufficient postage for delivery.

This 6th day of June 2005.

DENISE JEFFERSON CASPER
ASSISTANT UNITED STATES ATTORNEY