UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES OF AMERICA )
)
v. )     Criminal No. 04-10336-NMG
)
JOSE SANTIAGO, ET AL. )
Defendants )

GOVERNMENT'S OPPOSITION TO (1) DEFENDANT MIRANDA'S FIRST MOTION IN
LIMINE, (2) DEFENDANT NUNEZ'S MOTION IN LIMINE - SOFT EXPERTS, AND
MOTION IN LIMINE RE EXPERTS AND (3) DEFENDANT SANTIAGO'S OBJECTION TO
ITS SUMMARY OF TESTIMONY TO BE OFFERED UNDER FED. R. EVID. 702

Introduction

The United States, by its attorneys, Michael J. Sullivan, United

States Attorney, and William F. Bloomer, Assistant U.S. Attorney,

submits its Opposition to (1) Defendant Pedro Alberto Miranda's First

Motion in Limine (Expert Testimony), (2) Defendant Juan Nunez's Motion

in Limine – "Soft Experts," as well as his motion entitled "Motion of

Defendant in Limine RE Experts," and (3) Defendant Julio Santiago's

Objection to its Summary of Testimony to be Offered under Fed. R.

Evid. 702. (hereinafter "the Government's Summary").

The defendants' motions should be summarily denied because (1)

the proffered testimony of DEA Task Force Agent (TFA) Marcos Chavez is

not "expert" testimony falling within the parameters of Rule 702 and

therefore the strictures of Fed. R. Crim. P. 16(a)(1)(E)and (b)(1)(C)

do not apply,[1] (2) even assuming that the proffered testimony of Chavez

_____

[1]The undersigned prosecutor specifically noted in the
Government's Summary that it was questionable whether the anticipated
testimony of TFA Chavez and/or TFA Jamie Cepero and Lieutenant Terry
Hanson qualified as "expert" testimony for the purposes of Rule 702,
but provided the discovery "out of an abundance of caution." See ¶3
Government's Summary.  A copy of the Government's Summary is attached

or TFA Jamie Cepero constitutes "expert" testimony, the government's Summary of Testimony to be Offered under Fed. R. Evid. 702 – supplemented by even more detail below – more than adequately satisfies its discovery obligations in this drug trafficking case, and (3) it is well settled that testimony at trial from an experienced narcotics agent about coded language in the drug trade as well as general narcotics related matters is admissible.

To be clear, the government seeks leave to introduce into evidence at trial the testimony of TFA Chavez, who is a fact witness, and TFA Cepero, who is not a fact witness in this case. TFA Chavez participated in several controlled purchases of heroin from Reynaldo Rivera, Zuleima Reyes, and Santiago Arroy, and was responsible in large measure for monitoring the conversations in Spanish during the wiretap in this case.[2] DEA Task Force Agent Jamie Cepero, who has

---

hereto and incorporated herein by reference for all purposes as Attachment 1.

[2]In the Government's Summary, the prosecution indicated that it may introduce at trial the testimony of Lieutenant Terry Hanson to render opinions on general narcotics-related matters and the use of codes. Lieutenant Hanson did participate in the investigation and therefore is a "fact" witness. Lieutenant Hanson, however, is also a veteran narcotics investigator who has been recognized as an "expert" in these matters by courts of this Commonwealth. As the First Circuit has recognized,"'the line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion testimony under Fed. R. Evid. 701 . . . is not easy to draw.' (Citation omitted). Indeed, the same witness – for example, a law enforcement officer – may be qualified to 'provide both lay and expert testimony in a single case.'" United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005). The government presently anticipates eliciting sufficient information from TFA Chavez and Cepero with respect to narcotics-related matters, such as interpretation of codes and the significance of various items in narcotics distribution. However, depending on how the evidence develops at trial, the government (most likely on re-direct) may touch upon these matters with Lieutenant Hanson and therefore has included his name and credentials in its discovery materials. Additionally,

previously been qualified as an "expert" in narcotics-related matters by state and federal courts, did not participate in the present investigation, but will testify about general heroin distribution practices and his familiarity with, and the significance of various items seized in connection with this investigation.

The Substance of The Witness' Testimony<br>and the Bases for its Admission

*TFA Marcos Chavez*

TFA Chavez participated in five undercover purchases of heroin from Reynaldo Rivera involving his "runners," Zuleima Reyes and/or Santiago Arroyo, in December 2003 and January 2004. Having made undercover buys from several co-conspirators in this case, TFA Chavez was in a unique "insider" position with respect to some of the charged defendants' drug distribution activity. During his conversations with Rivera and Reyes related to the purchases of heroin, Chavez will testify that coded language was used over the telephone to discuss the substance heroin (for example, the terms "huevo" or "huevitos" meaning "egg" or "little egg" and "finger" were used to describe 10 grams of heroin). Following these undercover purchases of heroin from the defendants, five telephones and a pager associated with Julio Santiago, Rivera and their co-conspirators, were tapped pursuant to court orders. Hundreds of drug-related conversations between Santiago, Rivera and their associates were intercepted. During these conversations, coded and cryptic language was used to refer to heroin,

---

Lieutenant Hanson was the affiant in the wiretap applications and much of the interpretation of coded conversations are set forth in his affidavits in support of the issuance of wiretap warrants.

drug money, and activities and items associated with heroin distribution.  By way of examples, heroin was referred to in substance as, among other things, the following: "guys," "CDs" ("salsa" and "bacheta"), "papers," "registration papers," "dollars," "tickets," "workers," "that," "tires full of cars," "one(s)," "innings," "pesos," "cakes," "number," "money orders," "two of the good ones for Taylor," "100 flans," "plant," "time," and other cryptic terms.  Drug money was referred to in substance as, among other things, the following: "papers," "tickets," "that," "car papers," "luggage,""suitcases," and other vague terms.  Activities associated with heroin distribution, and heroin distribution itself, were referred to in substance as, among other thing, the following: "filling out some papers," "working on the car," "playing," "checking the carburetor and injectors," "playing [or watching] the game/ball or baseball," "getting ready to go to the beach," "factory job," and going to or taking trips to various locations.

    TFA Chavez has "particularized knowledge" of and "special familiarity" with the codes employed by the defendants to disguise the true nature of their dealings by virtue of his position as an experienced narcotics investigator who participated in undercover buys from members of this conspiracy and who personally monitored hundreds, if not thousands, of intercepted calls in which the defendants were participants.  See United States v. Ayala-Pizarro, 407 F.3d 25, 28-29 (1st Cir. 2005) (policeman allowed to testify as lay witness about area where the defendant was arrested for a narcotics offense as being a "drug point," and that heroin seized from that area matched the

4

appearance of the heroin seized from the defendant in that case);

United States v. Wilkerson, 411 F.3d 1. 6-7 (1st Cir. 2005) (proper to

allow a detective to testify his opinion as to the meaning of the

defendant's post-arrest statement concerning his attempt to escape

capture because he had "special familiarity" with the defendant's

escape route); United States v. DiMarzo, 80 F.3d 656, 659-660 (1st

Cir. 1996)(veteran agent permitted to testify that drug dealers do not

customarily bring casual observers to drug deals; testimony neither

lay nor expert opinion, but "simply the witness's personal experience

relating to a subject bearing directly upon the appropriateness of a

jury inference").

TFA Chavez, a veteran narcotics investigator who is fluent in

Spanish, was assigned to the DEA Drug Task Force during this

investigation.[3]  TFA Chavez was responsible in large measure for

monitoring the conversations, the majority of which were in Spanish,

intercepted during these wiretaps.  Among other things, Chavez will

testify in this case about: (1) the authentication of the wiretap,(2)

the way the wiretap investigation was conducted, (3) the

authentication of recordings of intercepted conversations in which one

or more defendants was a participant, (4) the identification of voices

of parties to intercepted conversations, and (5) the use of codes in

specific intercepted telephone conversations and his interpretation of

those codes in the context of heroin distribution.

Federal Rule of Evidence 701 provides,

_____

[3]The qualifications of TFA Marcos Chavez and Trooper Jamie Cepero
and Lieutenant Terry Hanson are set forth in detail in the
Government's Summary, attached as Attachment 1.

> If the witness is not testifying as an expert, the
> witness' testimony in the form of opinions or
> inferences is limited to those opinions or
> inferences which are (a) rationally based on the
> perception of the witness, (b) helpful to a clear
> understanding of the witness' testimony or the
> determination of a fact in issue, and (c) not based
> on scientific, technical, or other specialized
> knowledge within the scope of Rule 701.

The Rules of Evidence permit law enforcement agents to provide opinion testimony as lay witnesses about the meanings of conspiracy-specific coded terms from listening to a wiretap. See United States v. Garcia, 2005 WL 1444146 *7-12 (2nd Cir. (NY)); United States v. Grinage, 390 F.3d 746, 750 (2nd Cir. 2004), cert. denied sub. nom. Reneau v. United States, 125 S. Ct. 1961 (2005); United States v. Peoples, 250 F.3d 630, 641 (8th Cir. 2001).

Although the First Circuit has not addressed this issue with respect to Fed. R. Evid. 701 in the specific context of wiretap interceptions, several other circuits have allowed a law enforcement agent to testify as lay witnesses about such topics. United States v. Miranda, 248 F.3d 434, 441 (5th Cir. 2001); United States v. Novaton, 271 F.3d 968 (11th Cir. 2001), holding modified by Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co., 320 F.3d 1213, 1223 n.7 (11th Cir. 2003)(extending Novaton's holding to post-amendment Rule 701); United States v. Garcia, 994 F.2d 1499, 1507 (10th Cir. 1993)(FBI language specialist allowed to testify as lay witness under Rule 701 that co-conspirator was referring to defendant in conversation with defendant's wife when he referred to "your old man"). In these cases, for a law enforcement agent to testify about his opinion as a lay witness concerning conspiracy specific phrases

heard through a wiretap, the witness must have personally perceived
the conversation as it occurred. United States v. Peoples, 250 F.3d
at 641; United States v. Novaton, 867 F.Supp. 1023, 1025 (S.D. Fl.
1994). This does not require that the agent engage in the
conversation in question or that the participants must be aware of the
agent's presence, but that the agent overhead the conversation at the
time it occurred over the wiretap. United States v. Novaton, 867 F.
Supp. at 1025; compare United States v. Peoples, 250 F.3d 630, 640-41
(8th Cir. 2001)(error to admit an FBI agent's lay testimony about the
meaning of conspiracy-specific words, because agent had not listened
to the conversations as they occurred and instead based her opinion
only on "investigation after the fact"). In United States v. Novaton,
monitors of wiretap conversations were allowed to testify as lay
witnesses concerning references to planned drug sale events because
the monitors testified only about conversations that they themselves
listened to as the conversation occurred. 867 F.Supp. at 1025, 1026.

The Fifth, Eighth and Eleventh Circuits, however, have held that
an agent might have personal knowledge of the facts of the
conversation based upon listening to the overheard conversation at
some point in time, and on his overall participation in the wiretap
investigation or experiences with the suspects. See United States v.
Peoples, 250 F.3d at 641; United States v. Miranda, 248 F.3d at 441;
United States v. Novaton, 271 at 1008. For example, the Fifth Circuit
in United States v. Miranda allowed a FBI agent to testify about the
meanings of coded words used only by the conspiracy because he had
"extensive participation in the investigation of this conspiracy,

including surveillance, undercover purchases of drugs, debriefings of cooperating the monitoring and translating of intercepted telephone conversations." 248 F.3d at 441.  Implicitly, the court accepted that this agent's first hand knowledge came not from only what he directly overheard, but the totality of his experiences within the investigation.  See id.

Significantly, the First Circuit has found that the perception requirement of Rule 701 could be met by personal knowledge based on past experience or even experiences that occur later.  See United States v. Wilkerson, 411 F.3d 1, 7 (1st Cir. 2005); United States v. Ayala-Pizarro, 407 F.3d at 28-29.

In United States v. Ayala-Pizarro, a police officer was allowed to testify as a lay witness about a certain street where the defendant was arrested for a narcotics offense as being a "drug point," and that heroin seized from that area was "basically packed in . . . aluminum decks" (which matched the appearance of the heroin seized from the defendant in that case). 407 F.3d 25, 28-29 (1st Cir. 2005).  The Ayala-Pizarro Court specifically stated, "[w]e agree with the government that neither type of testimony was expert testimony at all, but was admissible as lay witness testimony under Fed. R. Evid. 701, even after the amendments to the two rules in December 2000." Id. The First Circuit held that the police officer had met the first hand perception requirement because he had "particularized knowledge" by virtue of his position as a police officer whose assignment was to patrol that street frequently.  Id.  The Court noted that, "'the line between expert testimony under Fed. R. Evid. 702 . . . and lay opinion

testimony under Fed. R. Evid. 701 . . . is not easy to draw.'
(Citation omitted). Indeed, the same witness – for example, a law
enforcement officer – may be qualified to 'provide both lay and expert
testimony in a single case.'" Id. The Court then concluded that the
witness' testimony "did not cross the line to become expert
testimony." Id.

Similarly, in United States v. Wilkerson, the First Circuit
allowed a detective to testify his opinion as to the meaning of the
defendant's post-arrest statement concerning his attempt to escape
capture, to wit: that he "grabbed the tall fence to get up on the
small fence." 411 F.3d at 6-7. The Court found that the detective
had met the "perception" requirement because he had "special
familiarity" with the defendant's escape route, having investigated it
both before and after interrogating the defendant. Id. The Court also
rejected the defendant's assertion that the statement was clear and
unambiguous, finding the detective's opinion to meet the helpfulness
requirement. Id.

In United States v. Villarman-Oviedo, a case nearly on all fours
with the present case, the First Circuit affirmed the District Court's
decision permitting a government agent to testify regarding the
meaning of code terms used in a drug conspiracy regardless of whether
the testimony was properly characterized as lay opinion under Fed. R.
Evid. 701 or expert testimony under Fed. R. Evid. 702. 325 F.3d 1, 13
(1st Cir. 2003). The District Court in Villarman-Oviedo allowed an
experienced narcotics detective, who had listened to thousands of
intercepted telephone calls, to testify about general narcotics

9

distribution activities in Puerto Rico as well as interpreting coded
language in the intercepted calls.  Id. at 7.  The First Circuit
concluded in the circumstances of this case that it was unnecessary to
decide the correctness in characterizing the witness' testimony as lay
testimony rather than expert testimony because the detective-witness
was qualified by experience and the "specialized knowledge" he had
acquired over the years to render opinions on the coded language used
by the defendants in that case and because the government's discovery
letter, which described "**the general context of his testimony**," gave
ample notice of the witness' specialized knowledge.[4] Id. at 7, 13
(emphasis added).

    Here, TFA Chavez listened to the majority of calls as they
occurred and relayed the information about these calls – including his
conclusion that certain coded conversations were drug-related – to the
agents in the field.  TFA Chavez will testify that in drug
investigations, drug traffickers use coded and veiled references to
hide their locations and rarely (if ever) use the words "heroin" or
"drugs."  Whether characterized as lay or expert opinion, TFA Chavez
is qualified to render his interpretation of these codes through (1)
his experience and training, (2) his participation in undercover buys
with members of the criminal organization, and (3) his monitoring of
the intercepted calls in which coded or cryptic language is used and

---

    [4]The discovery letter in Villarman-Oviedo informed the defendant
that the government intended to call the detective-witness "to testify
about factual matters and maybe as an expert witness. [The defendant]
was also informed about [the detective-witness'] background and
experience, **as well as the general context of his testimony**." Id. at 7
(emphasis added).

10

his participation in this investigation.

Moreover, the Government's Summary in this case – supplemented in even more detail above – goes far beyond simply identifying the general context of the witness's testimony approved in <u>Villarman-Oviedo</u>, and describes point-by-point the specific areas of testimony that it may pursue through its witnesses, including TFA Chavez. Santiago (and presumably others), however, appears to argue that he is entitled to a decryption of each and every coded conversation prior to trial – a virtual script of the witness' prospective testimony – which runs counter to the express mandate of Fed. R. Crim. P. 16(a)(1)(G) requiring the government to file a "**written summary**" of any Rule 702 testimony.  In the alternative, the defendants appear to seek unprecedented resort to criminal depositions and/or pretrial voir dire of the witnesses.  <u>See</u> Government's Opposition to Defendant's Motion for Deposition and cases cited therein (discussing the proper use of Rule 15 in a criminal proceeding).[5]

Additionally, it is utterly disingenuous of Santiago (or anyone else) to suggest that he has no idea which coded conversations the government seeks to admit into evidence and what the proposed meaning of those codes might be.  First, the affidavits submitted in connection with wiretap applications in this case, which have been

---

[5]Rule 15 permits depositions exclusively for the purpose of preserving testimony and even then only under exceptional circumstances.  <u>See</u> <u>U.S. v. Ferrera</u>, 746 F.2d 908, 913 (1st Cir. 1984) (District Court denial of request or deposition affirmed).  Indeed, the advisory committee's Notes to Fed. R. Crim. P. 15 specifically state, "The principal objective is the preservation of evidence for use at trial. It is **<u>not</u>** to provide a method of pretrial discovery nor primarily for the purpose of obtaining a basis for later cross-examination of an adverse witness." (emphasis added).

provided to the defense, are virtually replete with detailed

descriptions of numerous interceptions involving coded conversations

as well as the interpretation of those codes.  For example, paragraph

33 of an wiretap affidavit, dated September 29, 2004, states,

> On June 30, 2004 at 10:12 a.m. SANTIAGO called EDWIN TORREZ.
> During the conversation  Santiago agreed to "head down
> there".  TORREZ told SANTIAGO to "take two of the good ones
> for Taylor".  SANTIAGO informed TORREZ that they would meet
> "over there".  Approximately one hour later, surveillance
> agents observed both TORREZ and SANTIAGO leave their
> respective residences.  SANTIAGO was followed to a Mini Self
> Storage facility located on Foundry Rd, Lowell, MA.
> SANTIAGO parked next to the van utilized by TORREZ. At
> approximately 12:07 p.m. SANTIAGO and TORREZ simultaneously
> exited the storage facility, returned to their respective
> vehicles and departed the area.  Based on my training and
> experience it is my belief that the aforementioned
> conversation between SANTIAGO and TORREZ related to an order
> from TORREZ for two units ("take two down there") of heroin
> from SANTIAGO, and that SANTIAGO and TORREZ met at the Mini
> Storage Facility to consummate the transaction.

This is but one example of numerous, similarly-described and

decrypted conversations set forth throughout the wiretap affidavits in

this case.  Second, the defense has been given CDs of the intercepted

conversations and corresponding linesheets that detail the substance

of these calls, including the description of coded conversations.

These line sheets have actually been segregated by each individual

defendant to eliminate any difficulty for the defense to identify the

calls and coded conversations pertinent to their clients.  Third, the

government is in the process of preparing and submitting to the

defense finalized transcripts of intercepted calls, many involving

code, which it will seek to admit in evidence.  And fourth, even

assuming that TFA Chavez's testimony constitutes "expert" testimony

under Fed. R. Evid. 702, which the government does not concede, the

Government's Summary of his anticipated testimony – supplemented in
even more detail above – certainly satisfies its obligation to provide
a "written summary" of the general context of the expected testimony.
Villarman-Oviedo, 325 F.3d at 7, 13.

Similarly, the Government's Summary satisfies its discovery
obligations with respect to TFA Cepero. As noted above, TFA Cepero
did not participate in this investigation and therefore is not a fact
witness. Rather, TFA Cepero, a highly experienced narcotics
investigator who has previously been recognized as an expert by
federal and state courts in these matters, will testify to general
narcotics-related practices. The Government's Summary, set forth in
Attachment 1, describes the summary of anticipated testimony as
follows,

> Based on their examination, training, and experience,
> Troopers Cepero and/or Hanson and/or TFA Chavez ("the
> witness(es)") will testify to the general criminal
> narcotics-related matters, including undercover work;
> controlled buys; the use of confidential informants, search
> warrants, and electronic surveillance; how heroin is
> ingested an any paraphernalia associated with its use; the
> drug-distribution pyramid, including where and how heroin is
> manufactured, how it is imported into the U.S., and the
> general manner in which it makes its way to the ultimate
> consumer; the packaging associated with heroin distribution
> and the weights and purity in which it is commonly
> distributed from its point of arrival in the U.S. to the
> ultimate consumer; common diluents used to "cut" or lessen
> the purity of heroin; the price-ranges of various quantities
> of heroin in the Greater Boston area in 2004 and  the value
> of the heroin seized in connection with this case; the
> absence of the means to consume heroin in this case and its
> significance; the use of hidden compartments (or "hides")
> inside motor vehicles to store drugs, money or other
> paraphernalia in furtherance of drug distribution; the use
> of firearms as "tools of the drug trade" and as a means of
> protecting their drug business; the use of "stash pads" or
> apartments belonging to associates in the drug trade to
> store and distribute heroin from; counter surveillance
> measures to detect law enforcement; the use of various

implements in heroin distribution (many of which were seized
in connection with this case), including, but not limited to
scales, heat sealers, presses, spoons, surgical masks and
gloves, money, money counters, plastic baggies with or
without logos, false forms of identifications, pagers and
drug records or "cuff" sheets.  The witness(es) may also
discuss the use of portable cellular telephones and pagers
in drug distribution; that drug dealers frequently use
telephones subscribed to by other nominees or fictitious
individuals; and that drug dealers commonly "drop" or change
telephones in an effort to thwart law enforcement.  The
witness(es) may also discuss the common use of coded
language by drug distributors and the use of codes entered
into paging devices in furtherance of narcotics
distribution, and that various code words were used in the
present case to describe heroin, drug distribution, and
money, and codes were entered into Santiago's pager.  The
witness(es) will opine that the heroin seized in connection
with this case, along with the other drug-related
paraphernalia,  in particular the heroin seized from the
residences of Santiago, Rivera, Rodriguez, and the heroin
seized from  the person of Agosto and Rodriguez, is
consistent with the distribution of heroin rather than the
possession for personal consumption.

The government further supplemented this summary by means of a

letter dated September 13, 2006, indicating its witnesses may comment

on the common use of false identities or aliases by drug dealers.

These disclosures certainly satisfy the government's obligation to

provide a "written summary" – not a verbatim recital – of the general

context of the expected testimony.  Villarman-Oviedo, 325 F.3d at 7,

13.

Furthermore, assuming TFA Cepero's anticipated testimony

qualifies as "expert" testimony under Rule 702, it is clearly

admissible in this case.  The "district court has broad discretion" in

both "the decision to admit or exclude expert testimony" and

"determinations as to whether or not a proffered 'expert' is

sufficiently well qualified to speak to the subject matter."  Thus,

the district court's decision will be "entitled to considerable

14

deference in the Rule 702 milieu." <u>United States v. Hoffman</u>, 832 F.2d 1299, 1310 (1st Cir. 1987).

Under F. R. Evidence 702,"[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified to appear as an expert by knowledge, skill, experience, training or education may testify thereto in the form of an opinion or otherwise" as long as the information is reliable.

In <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, the Court defined the standard for admitting expert testimony under Rule 702. 509 U.S. 579 (1993). The two hallmarks of Rule 702 are that the evidence must be *relevant*, meaning that it will assist the finder or fact in understanding the evidence or determining a fact in issue. The evidence must also be *reliable*, which the Court defined as having "a reliable basis in the knowledge and experience of [the expert's] discipline." <u>Id.</u> at 591-92.

Though <u>Daubert</u> dealt with scientific testimony, the Court in <u>Kumho Tire Co. v. Carmichael</u> held that <u>Daubert</u> applied to non-scientific or technical expertise as well. 526 U.S. 137, 141 (1999). While a trial court may consider the specified factors listed in <u>Daubert</u>, "the test of reliability is flexible" and the trial court has "broad latitude" in determining that expert testimony is admissible. <u>Id.</u> at 141-42 (quotations omitted).

Drug dealers frequently use jargon that is specific to the industry or deliberately cryptic to avoid detection by law enforcement.  Consequently, "[l]ay jurors cannot be expected to be

familiar with the lexicon of the [drug] community." <u>Hoffman</u>, 832 F.2d
at 1310.  <u>See also United States v. Echeverri</u>, 982 F.2d 675, 680 (1st
Cir. 1993) ("Laymen, on average, are not familiar with the praxis of
the cocaine community."); <u>United States v. Ladd</u>, 885 F.2d 954, 960 (1st
Cir. 1989) ("[J]urors are not expected to be familiar with the idiom
and workings of the heroin community").  The First Circuit has
therefore recognized that "[i]t is clearly permissible for properly
qualified law enforcement agents to testify about...the meaning of
coded or slang words" in drug cases. <u>United States v. Tejada</u>, 886 F.2d
483, 486 (1st Cir. 1989) (emphasis added).

Moreover, training and experience in narcotics cases qualifies an
agent to testify as an expert on drug jargon.  As the First Circuit
has recognized "hard-core drug trafficking scarcely lends itself to
ivied halls.  In a rough-and-ready field such as this, experience is
likely the best teacher." <u>Hoffman</u>, 832 F.2d at 1310 (upholding DEA
agent with 12 years experience as expert).  <u>See also United States v.
Rivera-Rosario</u>, 300 F.3d 1, 17 (1st Cir. 2002) (upholding agent's
testimony as a "drug expert in coded conversations" based on agent's
"experience and training"); <u>United States v. Villarmein-Oveido</u>, 325
F.3d 1, 13 (1st Cir. 2003) (agent "was clearly qualified by experience
and the specialized knowledge that he had acquired over the years to
opine on the meaning of code words").

Nor does Nunez's motion seeking to preclude any government
witness from testifying on direct examination "based on informant
information he could not disclose on cross examination" have any
effect on the admissibility of so-called "expert" testimony in this

case.  The government will not attempt to "backdoor" hearsay information from an informant who provided information about the meaning of specific codes in this case to an investigator who will simply testify to what the CI said.  Therefore, neither the Confrontation Clause nor Rule 705 is implicated by the expert testimony in this case. See Delaware v. Fenster, 474 U.S. 15, 18-20 (1985).

It is abundantly clear that an agent is <u>not</u> precluded from testifying to the meaning of codes or general narcotics-related matters beyond the ken of ordinary jurors simply because that agent's knowledge is based in part upon dealings in the past with confidential informants.  Indeed, any holding to the contrary would eviscerate altogether the testimony of experienced narcotics agents because it would place an insurmountable burden on the government to show that the agent's testimony was completely unaffected by dealings and communications in the past with confidential informants.  There is no precedent for such an expansive limitation on "expert" testimony.

In <u>United States v. Angiulo</u> 847 F.2d 956, 974-975 (1st Cir. 1988), cited by Nunez in his brief, a law enforcement agent testified about the relationship of the defendant to an organized crime family. <u>Id</u>.  The trial judge instructed the agent to limit his testimony on direct to facts about which he could disclose the source of the information.  <u>Id</u>.  The First Circuit found that the testimony of the agent, though he had obtained general information from confidential informants, was admissible at trial because the agent's testimony concerning the particular charges against the defendant was limited to

his analysis of tape recordings.  Id.  Significantly, in determining that the agent's testimony was properly admissible, the Court in Angiulo found neither a violation of the defendant's Sixth Amendment right to Confrontation nor Fed. R. Evid. 705. Id.

Similarly, in this case the agents will testify to their analysis of recorded conversations between the co-defendants based on their education, experience, and training in the field of narcotics, not based upon interpretations of the specific coded conversations by an informant.  As noted above, such a practice has been roundly accepted, see Rivera-Rosario, supra at 17; Villarmein-Oveido, supra at 13, and the mere fact that the expert may have gained some general knowledge concerning coded language in narcotics trafficking from informants over the course of his career should not limit the testimony of that agent.  U.S. v. Angiulo, 897 F.2d 1169, 1188 (1st Cir. 1990) ("The fact that informant information furnished some part of the experts' background knowledge does not implicate the sixth amendment.").

<u>Conclusion</u>

For the above-enunciated reasons, the government respectfully urges this Court to deny the defendant's motions in limine and objections and to admit the anticipated testimony of TFA Chavez and Cepero, and to hold in abeyance its ruling on the admissibility of Lieutenant Terry Hanson.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    */s/ William F. Bloomer*
William F. Bloomer
Assistant U.S. Attorney

18

<u>Certificate of Service</u>

    I hereby certify that this document filed through the ECF system
will be sent electronically to the registered participants as
identified on the Notice of Electronic Filing (NEF) and mailed to all
those not participating in ECF.

*/s/ William F. Bloomer*
William F. Bloomer

Date: 21 September 2006