UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Criminal No. 04-10336-NMG |
| PEDRO ALBERTO MIRANDA | ) | |
| a/k/a "Tavo" & Carlos Colon | ) | |
| Defendant | ) | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Michael J. Sullivan, United States

Attorney for the District of Massachusetts, and William F. Bloomer, Assistant U.S. Attorney,

submits its Sentencing Memorandum with respect to Pedro Alberto Miranda ("Miranda").[1]

### INTRODUCTION

*Miranda conspired with the head of a massive distribution enterprise, Julio Santiago, and others to distribute heroin throughout the Greater Lowell area. He provided a safe haven for Santiago to deal heroin and to store money and drugs. He performed counter surveillance for Santiago during a drug deal. He further sought to expand Santiago's business to include other distributors for his and Santiago's gain. At the conclusion of the investigation on October 15, 2004, agents executed a search warrant at Miranda's residence and discovered the following accouterments of the drug trade: surgical masks, dust masks, boxes and bags of latex and rubber gloves, Inositol ("cut"), and a social security card and driver's license (bearing his photo) in the name of Carlos Colon.*

To determine a defendant's final sentence, this Court must follow the three-step

sentencing approach espoused by the First Circuit. United States v. Dixon, 449 F.3d 194, 204

---

[1]As this Court is aware, following a ten-day trial in October 2006, a jury returned guilty verdicts against five of the eleven codefendants in this case –Julio SANTIAGO, Juan NUNEZ, Carlos COLON (a/k/a Pedro MIRANDA), Jose RODRIGUEZ, and Carlos SANCHEZ -- with respect to Count One of the Superseding Indictment. The jury also found Julio Santiago guilty of the firearms offenses set forth in Count Seven, namely, possession of firearms in furtherance of a drug trafficking crime, and possession of unregistered firearms, to wit: silencers, (Count Eight). The jury further found that the conspiracy as a whole was responsible for more than 1,000 grams of heroin. With the exception of Enrique AGOSTO, who was severed from his co-defendants for the purpose of trial, the remaining six codefendants have pleaded guilty.

(1st Cir. 2006); <u>United States v. Jiménez-Beltre</u>, 440 F.3d 514, 518 (1st Cir. 2006) (en banc);

<u>United States v. Robinson</u>, 433 F.3d 31, 35 (1st Cir. 2005).  First, this Court must calculate the

advisory guideline range.  <u>E.g.</u>, <u>United States v. Pho</u>, 433 F.3d 53, 61 (1st Cir. 2006).  Second,

the Court must determine whether any traditional departures apply to the case at hand.  <u>E.g.</u>,

<u>United States v. Saez</u>, 444 F.3d 15, 17 (1st Cir. 2006).   Finally, the Court needs to determine

whether any factors put forth in 18 U.S.C. § 3553(a) offer a persuasive reason to impose a

sentence outside of the proposed guideline range.  <u>E.g.</u>, <u>Robinson</u>, 433 F.3d at 35.

<u>**ANALYSIS**</u>

According to the Presentence Report (PSR), Miranda is a Criminal History Category I.

(PSR ¶¶ 146-147).  Being responsible for between 100 and 400 grams of heroin, his Base Level

Offense is 26.  (PSR ¶ 134).   Because no other departures apply, Miranda's Total Offense Level

(TOL) is 26 and his Guideline Sentencing Range (GSR) is 63 to 78 months. (PSR ¶¶ 141, 187).[2]

He faces a statutory mandatory minimum of 5 years' imprisonment.  (PSR ¶ 198).

The government recommends a period of 74 months' incarceration to be followed by a

term of 4 years' supervised release.  Given the factors set forth in 18 U.S.C. §3553(a), imposing

the minimum possible sentence (5 years or 63 months) would clearly send the wrong message to

others given the nature and gravity of the defendant's offense.

A        <u>**Importance of the Guideline Range.**</u>

Even though the guidelines are advisory, the First Circuit has ruled that the guidelines

---

[2]Probation determined that Miranda was safety valve eligible. (¶ 186).  The government
objects to that determination because, in its view, Miranda's true identity has not been
conclusively established and therefore it is impossible to state with certainty whether he has any
prior criminal convictions under another name.  No matter, Miranda has not satisfied Criterion 5
of § 5C1.2.

remain a central component of any sentencing post-Booker.  Jiménez-Beltre,  440 F.3d at 518;
see also United States v. Kandirakis, No. 04-10372-WGY, 2006 WL 2147610, at *10 (1st Cir.
August 1, 2006) (stating "the Guidelines - and their judge-made factual findings - are still the
driving force behind federal sentencing").  The First Circuit explained that the  "guidelines
remained 'an important consideration' because they represented the only 'integration of the
multiple factors' identified in the statute, often reflected past practice, and bore the imprimatur of
the [Sentencing Commission] expert agency charged with developing them." United States v.
Smith, 445 F.3d 1, 4 (1st Cir. 2006), quoting Jiménez-Beltre, 440 F.3d at 518.  The continuing
importance of the guidelines is such that the more the judge's sentence differs from the advisory
guideline range - either higher or lower - the more compelling the judge's justification must be
for the atypical sentence.  See Kandirakis, 2006 WL 2147610, at *11; United States v. Thurston,
No. 05-2271, 2006 WL 2065404, at *4 (1st Cir. July 26, 2006); Smith, 445 F.3d at 4.

        The importance of the final guideline range has nothing to do with the guidelines' former
mandatory status, which was eliminated in Booker.  Instead, reasonableness is judged in relation
to the guidelines for three reasons adopted by the First Circuit in United States v. Jiménez-
Beltre: (1) only the guidelines comprehensively examine the full panoply of sentencing
considerations; (2) the guidelines represent decades of nationwide experience and study; and
(3) they are the only measure for avoiding unwarranted sentencing disparities.  See 440 F.3d at
518.  Congress explicitly created the Sentencing Commission and guidelines to achieve these
ends.  Id.

        The continued adherence to the now advisory guidelines remains evident in appellate
courts across the country.  While courts have repeatedly reversed as unreasonable sentences

outside the applicable guideline ranges,[3] reversals of sentences imposed within the guideline

range have been extraordinarily rare.  Kandirakis, 2006 WL 2147610, at *43 n.36; see also

United States v. Cooper, 437 F.3d 324, 331 (3d Cir. 2006) ("[I]t is less likely that a within-

guidelines sentence, as opposed to an outside-guidelines sentence, will be unreasonable");

United States v. Mares, 402 F.3d 511, 519 (5th Cir. 2005) ("[I]t will be rare for a reviewing court

to say [a within-Guidelines sentence] is 'unreasonable.'").  Indeed, in the post-Booker era, only

one within-guidelines sentence has been found blatantly unreasonable.  United States v.

Lazenby, 439 F.3d 928, 933 (8th Cir. 2006) (sentence based on comparison to co-defendant's

sentence found unreasonable).  Furthermore, just two additional sentences have been reversed

where the appellate court determined that the district court judge failed to provide an adequate

explanation of the within-guidelines sentence.  United States v. Carty, 453 F.3d 1214 (9th Cir.

2006); United States v. Vonner, 452 F.3d 560 (6th Cir. 2006).  Moreover, the First Circuit and its

sister circuits have emphasized that the further outside the range, either above or below, a

sentence falls, the stronger must be the justification for such disparate sentencing.

### 1. Weight

Here, the record – in the form of evidence introduced at trial and the reliable information

set forth in the PSR – clearly supports the finding that Miranda was responsible for 100 and 400

grams of heroin. (PSR ¶¶ 131-134).  See United States v. Panet-Collazo, 960 F.2d 256 (1st Cir.

---

[3]See, e.g, Zapete-Garcia, 447 F.3d at 60 (holding that defendant's forty-eight month sentence – eight times the maximum of the advisory sentencing guideline range – was unreasonable as the district court failed to provide a reason for such a mammoth variance and neither defendant's prior deportations or arrest justified the increase); Smith, 445 F.3d at 5-6 (finding that defendant's forty-six month sentence – less than half the minimum advisory guideline range – for six counts of crack distribution and one count conspiring to sell narcotics was unreasonable as the defendant's minor role was taken into account in the guideline calculation and the defendant had previously sold narcotics near schools, violated post-arrest release terms, and had no better than usual rehabilitation prospects).

1992) ("We review a trial court's findings of fact under the Sentencing Guidelines only for clear error").

(1)    Miranda permitted Santiago to use his residence at 212 Wilder Street, Lowell on August 27, 2004, to store 10 grams of heroin for Torrado to retrieve.  (Exhibit 53, tab R) (PSR ¶¶ 75-77). After agents observed Torrado and Santiago come and go from Miranda's apartment, Santiago called Miranda and informed him that he had "left some papers" in Miranda's apartment because police were there ready to give him a "ticket."  Miranda replied, "no problem."  (PSR ¶ 77);

(2)    On September 2, 2004, Miranda allowed Santiago to use his residence as a base of operations to distribute 50 grams of heroin to Rodriguez, 50 grams of heroin to Torrado, and 20 grams of heroin to Torrez.  (PSR ¶¶ 81-84, 88).  Specifically, Santiago called Miranda and said he wanted to go to Miranda's house to "fill out some papers." Santiago advised Miranda that it "may take sometime."  Surveillance agents then observed Santiago arrive at Miranda's residence later that evening, followed by Rodriguez, Torrado, and Torrez, who came and left Miranda's residence.  During this time period, agents observed Miranda outside his residence repeatedly sweeping one area of his drive way while looking around in a manner consistent with counter surveillance.  (PSR ¶¶ 86-88).  At one point, a call was intercepted during which Miranda discussed the presence of vehicles in the area with Santiago, including an occupied Volkswagen bearing a New Hampshire license plate.  Miranda asked Santiago if he (Santiago) wanted him (Miranda) to make the occupants of the vehicle leave, but Santiago instructed Miranda to "see who it is."  (Trial Exhibit #53) (PSR ¶ 86).  At that time, agents observed Miranda approach a red Volkswagen Passat with New Hampshire license plates and speak to its occupants. (PSR ¶86); and

(3)    On October 9, 2004, Santiago again used Miranda's residence at 212 Wilder Street for heroin distribution, this time to facilitate a 100-gram delivery to Enrique Agosto.  (PSR ¶ 99).

       There is additional evidence in the record to cement Miranda's relationship with Santiago in heroin distribution.  For example, on August 27, 2004, Miranda called Santiago and solicited Santiago's assistance with "a candidate to set up a little garage for me, man."  (Trial Exhibit #53, tab U)  Miranda described how someone had sent the police over to this person and his father, but that they want "to keep working . . . and they have a big clientele, man."  (PSR ¶ 76).  The fair inference, as the government argued at trial, is that Miranda was requesting

5

Santiago's assistance in establishing another drug distributorship or franchise.  (PSR ¶ 76). Miranda also warned Santiago to be very careful about going over to an area of Lowell following the murder of two Puerto Rican individuals because there were "state police, under-covers and everything, they are in that little town." Id.  Viewed from any angle, it would not be clear error to find by a preponderance of the evidence that Miranda was responsible for between 100 and 400 grams of heroin based on this record.[4]

    *2. Estoppel*

    Miranda contends that the government should be estopped from arguing that he is responsible for between 100 and 400 grams of heroin because the initial indictment alleged in a "Notice of Additional Factors" that he was accountable for between 80 and 100 grams of heroin. This argument is incorrect because it convolutes the burden of proof at trial (beyond a reasonable doubt) and sentencing (preponderance of the evidence).  Here, the initial indictment with its Notice of Additional Factors was issued in the aftermath of Blakely v. Washington, 542 U.S. 296 (2004), but before United States v. Booker, 543 U.S. 220 (2005).  After Booker made the Sentencing Guidelines advisory, the Superseding Indictment was returned against the defendant

---

[4]The government objects to the exclusion of relevant conduct from the Offense Conduct portion of the PSR pursuant to U.S.S.G. §1B1.3 (and touched upon in ¶¶ 149-151 of the PSR), which related to Miranda's arrest on September 28, 2002, at 11 Payne Street, Lowell, and the seizure of 50.01 grams of heroin and 61.44 grams of cocaine from that location.  Utilizing the Drug Equivalency Tables set forth in U.S.S.G. §2D1.1, Miranda should be held accountable for an additional 62.2 kilograms of marijuana for this conduct.  The government disagrees with the exclusion of this information from the Base Offense Level computation and to Probation's determination that it is not relevant conduct under § 1B1.3 because of the passage of time and the defendant's intervening arrest and detention.  It is the government's position that the defendant's prior activities and arrest are part of a common scheme / plan or the same course of criminal conduct between himself and Santiago.  The disagreement may be academic, however, because the  government agrees that -- even with the additional weight --  Miranda is still responsible for between 100 and 400 grams of heroin, and that his Base Level Offense is 26.

absent the Notice of Additional Factors.  The government is not precluded from arguing a greater quantity of heroin from that specified in the original indictment based upon a finding of the preponderance of the evidence, see United States v. Yeje-Cabrera, 430 F.3d 1,17-18 (1ˢᵗ Cir. 2005).  That the parties may have had preliminary discussions about a plea involving a weight of between 80 and 100 grams of heroin does not mean that the government is somehow estopped from advancing an argument for holding the defendant responsible for the proper and correct amount of heroin that he is responsible for.

   *3.  Appearance of Vindictiveness*

   The prosecution takes exception to any hint by the defense that it has acted (or might appear to have acted) vindictively in recommending a sentence based upon a weight of 100 grams or more of heroin.[5]  See Bordenkircher v. Hayes, 434 U.S. 357 (1978) (due process clause is not violated when a state prosecutor carries out threat made during plea negotiations to have the accused re-indicted on more serious charges on which he is plainly subject to prosecution if he does not plead guilty to the offenses to which he was originally charged); see also North Carolina v. Pearce, 395 U.S. 711 (1969) (where defendant had state conviction set aside on appeal, judge's unexplained threefold increase in punishment in new sentence violated due process).  That the parties may have had preliminary discussions about a plea involving a weight of between 80 and 100 grams of heroin does not mean the prosecution is somehow being "vindictive" in making a sentencing recommendation based upon the reliable and credible evidence which was developed at trial and included in the PSR.

---

   [5]Indeed, the defendant has benefitted from the prosecution's post-indictment evaluation of the evidence by means of a dismissal of the 851 Notice against him, which would have doubled the mandatory minimum sentence that the defendant now faces.

This case involved nothing more than the usual attempt to dispose of a matter short of trial. "A defendant simply has no right to a sentence, after trial, that is as lenient as a sentence he could have had earlier in a plea bargain." Yeje-Cabrera, 430 F.3d at 26-27. No threats, promises, or arm-twisting of any kind took place in this case. Indeed, the government's final letter to the defense begins with the following paragraph: "I am in receipt of your letter, dated September 20, 2006, in which you request the government's position regarding a plea agreement. As I stated in my letter dated February 10, 2006, the calculations in that document were non-binding, preliminary in nature, and subject to revision if they were in fact incorrect. What follows is similarly for discussion purposes only and is non-binding." To conclude that the prosecution is acting out of spite or vindictiveness in making a sentencing recommendation after trial in this case would not only be a personal indictment against the undersigned prosecutor, but a condemnation of the plea-bargaining regime in general – a concept that would certainly chill any future plea discussions entirely.

Although Yeje-Cabrera addressed the issue of prosecutorial vindictiveness in a pretrial setting, the First Circuit nevertheless recognized the realities of plea negotiations and trial practice which are pertinent here, stating "[i]n the course of preparing a case for trial, the prosecutor may uncover additional information that suggests a basis for further prosecution or he simply may come to realize that information possessed by the State has a broader significance. At this stage of the proceedings, the prosecutor's assessment of the proper extent of prosecution may not have crystallized. In contrast, once a trial begins -- and certainly by the time a conviction has been obtained -- it is much more likely that the State has discovered and assessed all of the information against an accused and has made a determination, on the basis of that

8

information, of the extent to which he should be prosecuted."  <u>Id</u>. at 26, n. 20.  Considering that the undersigned prosecutor had only recently taken over this 12-defendant case from a former Assistant U.S. Attorney when plea discussions began, it would be grossly unfair to characterize the prosecution as being "vindictive" for recommending a sentence based upon the proper and correct calculation of drug weight attributable to the defendant and proven at trial.

*4. Role*

Miranda did not register an objection to Probations's failure to give him a downward role adjustment under U.S.S.G. § 3B1.2 in the PSR and therefore any objection at this late juncture should be deemed waived.  Nevertheless, he is clearly not entitled to such a reduction on the state of the evidence.  Role adjustments are "heavily dependent upon the facts of the particular case." U.S.S.G. § 3B1.2, n.3(C).  To receive any reduction, Miranda must show that he is "substantially less culpable than the average participant."  U.S.S.G. §3B1.2, Application Note 3(A); <u>see</u> <u>United States v. Lopez-Gil</u>, 965 F.2d 1124, 1131 (1st Cir. 1992)("defendant has burden of proving entitlement to such a downward adjustment") <u>citing</u> <u>United States v. Ocasio</u>, 914 F.2d 330, 332 (1st Cir. 1990).  Moreover, the Guidelines caution that the minimal participant adjustment is to be used "infrequently."

Miranda must not only show that he is less culpable than most others involved in this particular offense, but that he is less culpable than defendants charged in similar cases.  <u>See</u> <u>United States v. Ortiz-Santiago</u>, 211 F.3d 146, 149 (1st Cir. 2000)("defendant has the burden of proving that he is both less culpable than most others involved in the offense of conviction and less culpable than most other miscreants convicted of comparable crimes.").  Recently, in <u>United States v. Cao</u>, No. 06-1224 (C.A. 1 (Me) December 15, 2006), the First Circuit affirmed the

district court's decision at sentencing not to give the defendant a role reduction as a minor or minimal participant.  Even though the defendant was less culpable than the leaders of the conspiracy, "that is not enough: he was required to show that he was less culpable than the average participant, a judgment normally made not with statistics but by practical indicia like role, frequency, and duration."  Id. at 4.

Here, Miranda permitted Santiago to use his home as a base of operation to distribute and store substantial quantities of heroin.  He acted as a look-out on one occasion while Santiago distributed more than 100 grams of heroin inside Miranda's house.  He proposed setting up a new heroin franchise with Santiago that had a potentially large customer base.  He stored heroin processing equipment in his home.  He simply was not "substantially less culpable than the average participant."  U.S.S.G. §3B1.2, Application Note 3(A).  His assistance was critical to the success of Santiago's operation.  No role reduction is warranted.

**B.    Application of the § 3553(a) Factors.**

In this case, no unusual circumstances exist which warrant an exception to the preference for guideline sentencing.  Section 3553(a)(4) and (5) specifically direct the Court to consider the applicable guidelines, and Section 3553(a)(6) commands that the Court strive to avoid disparity in sentencing, which, as explained above, is best accomplished through faithful application of the guidelines.  The other 3553(a) factors also point to this conclusion.  While all § 3353(a) factors must be considered by this Court, "it is not required to address those factors, one by one, in some sort of rote incantation when explicating its sentencing decision."  Dixon, 449 F.3d at 205; see also United States  v. Navedo-Concepcion, 450 F.3d 54, 57-58 (1st Cir. 2006) (reasoning that in every decision the main factors contributing to the sentence must be identified by the sentencing

court, but there is no "requirement for a lengthy or detailed recitation or one addressing every claim and counter-argument; rather, the reviewing court needs, and both parties deserve, a *specific* explanation and not just a reference to the evidence.").

The defendant refused to provide his place of residence to Probation.  (PSR ¶ 155). Miranda  is a 38-year-old male who is in fair health. (PSR ¶¶163-165).  He denied having any mental or emotional problems aside from shortness of breath.  (PSR ¶166). Miranda refused to discuss past drug use, but provided a proffer through his attorney admitting to marijuana and cocaine use (PSR ¶ 168).   Although he has limited education (PSR ¶169), he claims to have supported himself through regular employment over the years.  (PSR ¶¶ 173-176).

In short, the PSR reflects nothing unusual or extraordinary in Miranda's background to justify taking him outside of the heartland of cases already addressed by the Sentencing Guidelines.  C.f., Koon v. United States, 518 U.S. 81, 116 S.Ct. 2035, 2047 (1996) ("[b]efore a departure is permitted, certain aspects of the case must be found unusual enough for it to fall outside the heartland of cases in the Guideline"). Nothing should steer him outside the federal sentencing guideline range.  See United States v. Thurston, No. 05-2271 (1st Cir. July 26, 2006) (discussing Congressional goal of promoting national uniformity in sentencing).

**C.  Sentence**

The government recommends a term of 74 months' imprisonment with 4 years' supervised release.  In light of the quantity of heroin that the defendant is accountable for, the government's recommendation is reasonable, United States v. Jiminenez-Beltre, 440 F.3d 514, 518 (1st Cir. 2006)(en banc), and in accord with the overarching principles and policies

expressed and incorporated in the Sentencing Guidelines.

RESPECTFULLY SUBMITTED
MICHAEL J. SULLIVAN
United States Attorney

By:    */s/ William F. Bloomer*
WILLIAM BLOOMER
Assistant U.S. Attorney
BBO#553104
william.bloomer@usdoj.gov
(617) 748-3644

## CERTIFICATE OF SERVICE

I, William F. Bloomer, hereby certify that this document filed through the ECF system on

April 5, 2007, will be sent electronically to the registered participants as identified on the Notice

of Electronic Filing (NEF).

*/s/William F. Bloomer*
WILLIAM F. BLOOMER

Date: 5 April 2007